## VIGOR v. CHESAPEAKE & O. RY. CO.
### No. 6692.

Circuit Court of Appeals, Seventh Circuit.
Feb. 23, 1939.

Bomberger, Peters & Morthland, of Hammond, Ind., and Albert H. Cole, of Peru, Ind., for appellant.

Clarence C. Chilcott, of Kansas City, Mo., and Timothy P. Galvin, of Hammond, Ind., for appellee.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

**SPARKS, Circuit Judge.**

Appellee's decedent was employed by appellant as a railroad brakeman. The complaint sought to recover damages for his death, which occurred during such service, as a result of appellant's alleged viola- tion of the provisions of the Federal Safety Appliance Act, 45 U.S.C.A. § 1 et seq., with respect ·to car couplers. At the conclusion of appellee's evidence appellant moved for a directed verdict, whereupon appellee like- wise moved for a verdict in its favor. This in effect removed the case from the jury, and without further evidence the court overruled appellant's motion, and sustained appellee's motion, rendering judgment for her. From this judgment the appeal is prosecuted.

There is no material controversy as to the facts, which in substance are as fol- lows: At the time of the incident in ques- tion appellant was a common carrier by railroad and operated a line of railroad in Ohio from Walbridge, six miles out of To- ledo, to Columbus. Marion lies forty-five miles northwest of Columbus, and eighteen miles northwest of Marion is Upper San- dusky. On the evening of February 27, 1936, the freight train in question, consist- ing of 153 empty coal cars, left Walbridge for Columbus. The crew consisted of an engineer, fireman, head brakeman, conduc- tor, and decedent who was rear brakeman, or flagman. He had been in the employ of appellant as a brakeman or conductor for eighteen or twenty years. Before arriving at Upper Sandusky three stops were made, two for grade crossings and one for taking coal and water. At Upper Sandusky one loaded box car and two empty coal cars were picked up from a side track and placed next to the engine and tender, the loaded car being placed between the two coal cars. The train thus proceeded to the north part of Marion, where it again stop- ped for water, and then proceeded through Marion to a point about twenty-two miles from Upper Sandusky. Here, at about 2:50 A. M. while running at a speed of fifteen or twenty miles an hour, on smooth track, the tender of the engine separated from the first car, thus causing the brakes on all the cars to set and the entire train of cars to come to a sudden and violent stop. Decedent was sitting in the cupola of the caboose and was severely injured, from the effects of which he died later. The impact was of such force that the hinges of the ca- boose door were pulled from their moor- ings and the door was thrown seven or eight feet; the north side of the stove was broken out; the light brackets were broken from the walls; the wall and water tank were upset; the windows were broken; and the caboose and ten or fifteen cars at

the rear were knocked off center—that is to say their rear trucks were out of place. The car that became detached from the tender was set off at Marion, and the remaining cars and caboose excepting the ten or fifteen damaged cars, were pulled into Columbus.

After the accident every member of the crew, except decedent, made more or less of an inspection of the couplers. None of them recalled any difficulty in making the coupling at Upper Sandusky. Appellant relies considerably upon these inspections and we shall set forth their substance. The engineer saw a bright narrow mark on the top of the drawbar of the tank, indicating that the drawbar had slid over. It was across the top of the coupler. The knuckle at this place was about one-half inch wide and this was the width of the mark. He could not see whether the mark went clear across the knuckle which was closed when he saw it. He made no examination of the other knuckle. They were both standard knuckles. The air hose was uncoupled.

The conductor coupled the rear end of the tender to the car when it was placed in the train, noticing nothing wrong with the coupler on either the tender or car; on both the couplers were open; he gave a back-up signal, and the coupling was made on the first impact. He did not see the drawbar on the car attached to the tender, just after the accident, but later, at Marion, he saw the drawbar on the tender. It seemed to be all right except that he observed two bright marks over the top of it, and two rough marks on the knuckle of that drawbar. These marks were about two and one-half inches in width and length. There were corresponding marks on each side of the top of the knuckle which was closed when he observed it. He did not attempt to manipulate it. The fireman also observed similar marks on the tender coupler, and a like mark upon the bottom side of the knuckle on the car. He was unable to determine why the train broke in two. However, his investigation was not made for that purpose, but only to determine whether the bolt and pin were all right, and whether the union rivets were all intact so that they could move the train. He found them all right on the tank, but did not testify as to the condition of those on the car. However, he found both knuckles closed, as they were supposed to be. He said that oftentimes a knuckle will close while running, but that it was unusual for a knuckle to open while running. Only once in a while would this occur. There was nothing in this instance that would indicate to him that the knuckle had opened. He said he could not tell because he was only a fireman.

The head brakeman manipulated both couplers to see that they worked all right. He saw the bright mark on the coupler of the tender but did not examine the bottom of the knuckle on the car. He manipulated both knuckles by raising the latches which controlled them. He raised the levers by pushing them and jerked up on the pin lifter, whereupon the knuckle flew partly open, and he closed it. Repeating the operation, the knuckle again flew partly open, and he opened it completely by reaching in with his hand, and assisting it. This occurred on both knuckles. He saw no one else make any inspection at that time. He did not make the coupling on the car when it was set out at Marion. This was done by a brakeman from Marion, who took decedent's place. He did not testify nor does the record disclose his name.

The record does not disclose the exact cause of the separation of the car from the tender, nor was any member of the crew able to assign any reason for it. It is obvious, however, that it occurred either because the car was not completely coupled to the tender when it was picked up at Marion, or because it became uncoupled thereafter through some undisclosed defect of the coupler or its appliances. In either event there were certain duties owing by appellant to decedent with respect thereto, which if violated would entitle decedent or his estate to compensation for damages proximately caused thereby. Here there is no question raised as to the damages sustained, and it is neither claimed nor proved that decedent contributed in any manner to the injury.

It is appellant's contention that the complaint does not charge defendant with any negligence other than a violation of the Safety Appliance Act, 45 U.S.C.A. § 2.[1]

1 "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

It is not denied that the duty to maintain couplers in the operative condition prescribed by the statute is absolute, and that the liability of a railroad for injury to its employee, sustained by reason of its failure to so equip its cars, is likewise absolute and in nowise dependent upon the want of reasonable care. Louisville & Nashville R. Co. v. Layton, 243 U.S. 617, 37 S.Ct. 456, 61 L.Ed. 931. It is obvious, therefore, that before appellee could recover under this section of the statute, the injuries to decedent for which she seeks recovery must have been proximately caused by the failure of the car and tender to couple automatically, or by the fact that they were not capable of being uncoupled without the necessity of men going between the ends of the car and tender. This does not mean that the decedent must have been engaged in the act of coupling or uncoupling the cars at the time of the injury, for the Act extends its protection to employees other than those engaged in coupling or uncoupling operations. Louisville & Nashville R. Co. v. Layton, supra; Minneapolis & St. Louis R. Co. v. Gotschall, 244 U.S. 66, 37 S.Ct. 598, 61 L.Ed. 995.

Mr. Roberts, in his Federal Liabilities of Carriers (2d Ed.) sec. 620, p. 1211, states, " * * * the true rule to be deduced from the cases is that while the statute does not require a carrier to use only cars which will remain coupled until the uncoupling device is operated, proof that cars became uncoupled while in use, without human intervention, either because the coupler or some part thereof broke, or for some unexplained reason, is evidence from which a jury is entitled to infer that the coupler was not in condition to perform the function required of it by the statute, and hence that the Act was violated." He further states that this inference is at most a rebuttable one, which is completely destroyed by affirmative evidence that the couplers complied with the specific standards prescribed by the statute.

We think this rule is a fair deduction from the decisions. The District Court, therefore, was warranted under the evidence in inferring that the coupler was not in condition to couple automatically by impact, and that it was not completely and effectively coupled to the tender when first placed in the train. It is obvious that the injury was not caused by the coupling being incapable of being uncoupled without the aid of an employee going between the cars, for the contrary is precisely what happened, so far as this record discloses.

Appellant insists, however, that under the rule it has completely overcome the inference by undisputed proof that when the car was first placed in the train the couplers did automatically couple by impact, and that the mere fact that a coupler broke or gave way was not sufficient to establish a violation of the statute relied upon, even though the coupler broke because of some defect caused by appellant's negligence, or otherwise. But in this case the coupler was not broken and there was nothing to indicate that any part of it had given way. These facts were supported by all the witnesses who testified on this subject. They were appellant's employees and they tell us that the couplers were in good condition both immediately before and after the accident, except the head brakeman who, in his manipulation of both knuckles after the accident, said that neither would completely open by raising the lever and jerking the pin, until he assisted them by reaching in with his hand. If a coupler fails to function, such fact is sufficient evidence of its defective character regardless of how it functioned before or after such failure. Minneapolis & St. L. R. Co. v. Gotschall, supra; Anderson v. Chesapeake & O. Ry. Co., 263 Ill.App. 601; Davis v. Minneapolis & St. Louis Ry. Co., 134 Minn. 369, 159 N. W. 802, certiorari denied 242 U.S. 650, 37 S.Ct. 243, 61 L.Ed. 545. See Curran v. Chicago Short Line R. Co., 198 Ill.App. 154, contra.

The evidence upon which appellant relies to prove that a perfect coupling was made when the car was first picked up was the testimony of the conductor who made the coupling. Both couplers were open; he noticed nothing wrong with either; he gave a back-up signal; and the coupling was made on the first impact. This testimony is supported by the fact that the train was then pulled twenty-two miles before the uncoupling occurred, during which time it had stopped for water and started again. Upon this evidence appellant lays great stress, and rightly so. However, with this evidence we must also consider the testimony that no part of the couplers was broken, the knuckles would not open completely without the aid of the hand, and there were unusual bright marks found upon the drawbars which were obviously caused by undue friction. When we consider all the evidence on this subject we are

at once in doubt as to whether there was a complete coupling made when the car was first picked up. Whether there was a partial coupling which enabled the train to run for twenty-two miles without separating we do not know, nor was the burden upon the appellant to establish the affirmative of that question. The District Court was confronted with the problem of determining whether the evidence overcame the inference in appellee's favor as laid down by the decisions and as set forth by Mr. Roberts. It is obvious that the court held that the inference was not rebutted, and from all the evidence we can not say that it was.

Appellant urges that this case should be controlled by New Orleans & N. E. R. Co. v. Scarlet, 249 U.S. 528, 39 S.Ct. 369, 63 L. Ed. 752, and Lang v. New York Central R. Co., 255 U.S. 455, 41 S.Ct. 381, 65 L.Ed. 729. We think both cases are readily distinguishable from the instant case. In the Scarlet case the injury was caused by the uncoupling of the engine and tender, which was apparently due to the breaking of the king pin which fastened the drawbar to the tender, and the chains. The action was brought in the state court of Mississippi under the Federal Employers' Liability Act, 35 Stat. 65, 45 U.S.C.A. § 51 et seq., and the Boiler Inspection Act, 36 Stat. 913, as amended, 38 Stat. 1192, 45 U.S.C.A. § 22 et seq., and Scarlet recovered judgment which was affirmed by the Supreme Court of that State. The "Prima Facie Act" of Mississippi, section 1985 of the Code 1906, was applied by the court, which if applicable relieved Scarlet of the burden of proof to establish negligence. The trial court held that it was applicable and so instructed the jury. Upon argument in the Supreme Court, it was conceded that the Act was not applicable to cases brought under the Federal Employers' Liability Act in view of the decision in New Orleans & N. E. R. Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167. Scarlet contended that the error was harmless, in that under the Boiler Inspection Act it was not necessary to establish negligence. The Supreme Court was unable to say that the railroad was not prejudiced by the error and said that the mere breaking of the king pin and chains did not establish as a matter of law that they were defective. The company contended that the evidence showed conclusively that the breaking of the chains and the king pin was the proximate cause of the injury, and that therefore it was entitled to a peremptory instruction in its favor. The Supreme Court said that at most it presented a question for the jury. In the instant case, where the cause of the injury is unknown, it would seem that there was all the more reason why there should not have been a peremptory finding for the company. In the Lang case it was held that the collision was not the proximate result of failing to provide a proper coupler.

However, if it be conceded that the inference in decedent's favor was effectively rebutted, and that appellant was not liable under the statute, yet, under the pleadings and evidence, we think a proper verdict was reached on the theory of appellant's negligence under the doctrine of res ipsa loquitur. Chesapeake & O. Ry. Co. v. Smith, 6 Cir., 42 F.2d 111; Kaemmerling v. Athletic Mining & Smelting Co., 8 Cir., 2 F.2d 574; Cochran v. Pittsburgh & L. E. Ry. Co., D.C., 31 F.2d 769.

In this respect appellant contends that the complaint is not based on the theory of negligence. It must be conceded that the pleading is not a model one for that purpose, and that it more perfectly states a cause of action for violation of the statute. However, it alleges that the injury was caused by reason of the negligence and carelessness of the defendant, and the defective, unsafe and insecure equipment then and there owned and being used by defendant in interstate commerce. It was not necessary to allege negligence or carelessness in a suit based upon a violation of the statute, and appellant was therefore put upon notice that appellee was relying upon negligence and carelessness whether they were properly pleaded or not. Of course, it is not proper to plead different theories in the same paragraph, but it is not necessarily fatal especially when the adversary makes no objection. Here appellant raised no objection to the form or content of the complaint by demurrer or motion, and we think it is in no position to object after going to trial on the general issue.

Judgment

Affirmed.