## EKER v. PETTIBONE.

### No. 6994.

Circuit Court of Appeals, Seventh Circuit.
March 13, 1940.

Cope J. Hanley, of Chicago, Ill., Frederick C. Crumpacker, of Hammond, Ind., and Owen W. Crumpacker, of Whiting, Ind., for appellant.

Timothy P. Galvin, of Hammond, Ind., and Charles L. Vaughan, of LaFayette, Ind., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This appeal is from a judgment in a suit to recover damages sustained by reason of the death of plaintiff's intestate.

The action was predicated upon a complaint of two paragraphs, the first charging a violation of the Boiler Inspection Act, 45 U.S.C.A. § 23, and the second, negligence in violation of the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–59. The only question here raised is whether or not the evidence was sufficient to justify the action of the court in refusing to direct a verdict for the defendant.

On June 12, 1936, about 5 o'clock P. M., defendant's freight train, consisting of the engine and 41 cars, was traveling north at the rate of 35 miles per hour in Putnam County, Indiana. At a point near Putnamville, the engine and 16 cars were derailed, and plaintiff's decedent, the engineer, was killed by escaping steam. It is undisputed that the derailment was occasioned from the fact that the pony-truck (the small wheels in front of the drivers) jumped the tracks. This happened 4,556 feet south of the point of final derailment and for this distance, the train traveled with the pony-truck off the rails. This was plainly evidenced by the marks, cuts and damage shown to have been done to the ties and road bed. A short distance north of the Putnamville station, there extended from the main track a switch, and when the train arrived there, the pony-truck followed the switch tracks, causing the wreck. As the train approached Putnamville, the conductor, fireman and head brakeman were in the engine cab with the decedent. The first two were witnesses at the trial. According to their testimony, they had no information that anything was wrong until at a point about 500 feet south of the final derailment. At that point the engine lurched and the engineer threw on the emergency brake and did what he could to stop the train.

The pony-truck wheels are at the front of the engine immediately behind the pilot. They serve as guides or pilots and carry a portion of the weight of the engine. They weigh about 8,000 pounds and are fastened to the frame of the engine by a pin, called the radius bar pin, extending through the hole in the radius bar. This pin is held in place by a rectangular plate (weighing 35 pounds), bolted to the frame of the engine at each corner. This plate is held to its position by four bolts, one at each corner. About three weeks prior to the wreck, the engine had been overhauled, the worn parts renewed and a new radius bar pin and plate installed. The engine was inspected on the day and just prior to the start of its ill-fated trip. At that time the four bolts connecting the radius bar plate to the frame of the engine were in position. After the accident, two of the bolts holding the plate to the frame were missing and the plate was slightly separated from the frame. There was evidence more or less of an opinion character, to the effect that it appeared the bolts missing from the radius bar had been off for some time. A number of witnesses testified for the defendant that the absence of the bolts could not have caused the pony-truck to leave the rails.

There was evidence, although disputed, that the ties in the road bed were rotten and split; that they were worn; that the rails were sunk deeply into the ties and, that there were places where the water stood around the ties. The track and right-of-way were inspected and thoroughly searched by railroad employees, officials and other persons following the accident, for evidence which might account for the derailment, but without success.

About 700 feet south of the point where it appears the pony-truck left the track, one Evans was plowing corn in a field adjoining the railroad. He testified, as the train passed, that he heard a snapping sound; that something seemed to break and quite a bit of gravel was thrown over him and his team. The next day he examined the track at the point where the engine was at the time of the occurrence of the incident on the previous day and found a fresh scar three inches long on the top of one of the rails. Nearby was a hole in the road bed about the size of a man's hat.

The Section of the Boiler Inspection Act relied upon, provides: "It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb * * *." 45 U.S.C.A., Sec. 23.

The complaint charges that the locomotive was not in proper condition and safe to operate, but instead was an unnecessary peril to life and limb in that the pony-truck of the locomotive was negligently and improperly secured; that the king pin which held said trucks in place had become loose, worn and out of repair and, that the pony-truck was defective and negligently permitted to remain in said condition.

■ Defendant concedes that its duty is mandatory and absolute—the construction often placed upon this Act—yet it argues there can be no recovery because (1) there is no evidence of a violation of the Act, and (2) that even if so, it was not the proximate cause of decedent's death. A study of the cases relied upon by both parties convinces us that its contention must be denied.

The decision in Minneapolis & St. Louis R. R. Co. v. Gotschall, 244 U.S. 66, 37 S. Ct. 598, 61 L.Ed. 995, in our judgment, comes near being decisive. There, a brakeman was walking along the top of a train of cars when the train separated because of the opening of a coupler on one of the cars, resulting in an automatic setting of the emergency brakes and a sudden jerk which threw the brakeman off the train, by which he was killed. It was there contended there was no evidence of neglect on the part of the company except the mere fact that the coupler failed to perform its function and, that to permit the jury to infer negligence amounted to an application of the principle designated as res ipsa loquitur. With reference to this contention, and the cases cited in its support, the court, on page 67 of 244 U.S., 37 S.Ct. at page 599, 61 L.Ed. 995, said: " * * * We think the contention is without merit because, conceding in the fullest measure the correctness of the ruling announced in the cases relied upon to the effect that negligence may not be inferred from the mere happen-ing of an accident except under the most exceptional circumstances, we are of opinion such principle is here not controlling in view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars. * * *"

This court in Vigor v. Chesapeake & O. Ry. Co., 7 Cir., 101 F.2d 865, had before it a case, the facts of which were much like those in the Gotschall case. The accident was due to the failure of a car coupler to properly operate. It was shown that it was in proper condition both before and after the accident. The court said, 101 F.2d at page 868: " * * * If a coupler fails to function, such fact is sufficient evidence of its defective character regardless of how it functioned before or after such failure. [Citing cases] * * *"

In Anderson v. Baltimore & O. R. Co., 2 Cir., 96 F.2d 796, the plaintiff was killed by a train on an adjacent track while standing beside his engine for the purpose of ascertaining why its sanding apparatus had failed to function. The court, on page 798 of 96 F.2d said: " * * * The failure of the apparatus gave rise to an inference of some defect, and whether that inference was overcome by the defendant's explanation was a question for the jury on all the evidence. * * *"

In Didinger v. Pennsylvania R. Co., 6 Cir., 39 F.2d 798, the court considered a case based upon Sec. 11 of the Safety Appliance Act, 45 U.S.C.A. § 11, concerning the duty of the carrier to equip and maintain hand brakes in efficient condition. The court, on page 799 of 39 F.2d said:

"There are two recognized methods of showing the inefficiency of hand brake equipment. Evidence may be adduced to establish some particular defect, or the same inefficiency may be' established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner.' * * *

"Assuming the proper setting of the brake, the fact that it did not hold demonstrates its inefficiency. * * *"

Defendant seeks to distinguish the Gotschall, Vigor, Anderson and Didinger cases from the instant one on the theory that in those cases the court was considering "parts and appurtenances" rather than the locomotive itself. The defendant states its contention thus: " * * * The cases cited have to do with couplers, hand brakes and those attachments and devices which clearly fall

within the description of parts and appurtenances, but the pony-trucks (for the purpose of the rule under discussion) must be treated as the engine itself. If plaintiff's contention is correct it might be said that the derailment of an engine justifies the inference that its parts and appurtenances are not in working order, and it is our contention that the statute cannot be so construed. * * *"

■■ We do not believe there is any logical basis for such distinction. The Act is applicable to "the locomotive, its boiler, tender and all parts and appurtenances thereof," and we do not see how it can make any difference whether the defect is in the locomotive itself or in one of its parts or appurtenances. If the mere failure of a coupler to open, as was the situation in the Gotschall and Vigor cases; the failure of an apparatus to function, as in the Anderson case, or the failure of a brake to hold, as in the Didinger case, is sufficient to create an inference or make a prima facie case of a violation of the Act, we can see no reason why the failure of the pony-truck to function does not likewise create an inference of a violation of the statutory duty, and this, irrespective as to whether the pony-truck be considered as a component part of the locomotive itself or merely an appurtenance thereof. The function of the pony-truck is to pilot and guide the engine along the rails. It failed to perform that function, and thus failing, caused the engine to leave the rails and turn over. We think there can be little, if any, doubt that the fact that the pony-truck left the rails for no apparent reason, raises an inference which was sufficient to take the case to the jury. Especially is this true in view of the fact that a thorough search and investigation was made, but without success as to what did or might have caused the pony-truck to jump the track.

Among the cases relied upon by the defendant is that of Baltimore & Ohio R. Co. v. Groeger, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419, but we think it affords little, if any, support to the defendant's theory. In that case it was charged (1) that the engine was in a dangerous condition and (2) there was a failure to equip the boiler with a fusible plug. It was shown that the boiler which exploded had seven broken staybolts in violation of a rule of the Interstate Commerce Commission. This condition, without dispute, had nothing to do with the explosion. Plaintiff also relied upon the absence of fusible plugs, which were not required by law. It was upon an improper instruction concerning the latter matter that the case was reversed. The only other evidence concerning the condition of the boiler was that a few minutes before the explosion, steam was seen escaping from the boiler into the firebox. The court, on page 527 of 266 U.S., 45 S. Ct. on page 172, 69 L.Ed. 419, said: "* * * But we agree with the Circuit Court of Appeals that, under section 2 of the statute, there was sufficient evidence to sustain the verdict, wholly apart from the broken staybolts. Defendant's duty to have the boiler in a safe condition to operate so that it could be used without unnecessary peril to its employees was absolute and continuing. No notice to the defendant, actual or constructive, of the defects or unsafe condition of the boiler was necessary to plaintiff's case. Defendant is liable if its breach of duty contributed to cause the death. * * *"

It appears the mere fact that steam was seen escaping from the boiler a few minutes before the explosion, in connection with the explosion itself, was regarded by the court as sufficient to create an inference of a violation of the defendant's statutory duty. It would appear equally certain in the instant case that the situation with reference to the pony-truck would also create an inference of a breach of duty on the part of the defendant. That the nonperformance of the pony-truck not only contributed to the accident, but was the proximate and direct result thereof, there can be no doubt.

■■ Under the second paragraph of the complaint, the burden was upon the plaintiff to establish negligence on the part of the defendant. Plaintiff contends that negligence is inferable from the facts and circumstances of the case, while the defendant contends that the cause of the accident is one purely of conjecture or surmise without any showing of negligence or proximate cause. The defective condition of the road bed was the negligence charged in this paragraph, and while the evidence in that respect is not of a convincing character, especially at the point where the pony-truck left the tracks, yet we think it was sufficient to raise a jury question. The language of the court in Baltimore & O. S. W. R. Co. v. Hill, 84 Ind.App. 354, 148 N.E. 489, certiorari denied, 273 U.S. 738, 47 S.Ct. 246, 71 L.Ed. 867, under similar circumstances, is pertinent. The court said, at page 491 of 148

N.E.: "Appellant lays much stress upon the fact that counsel for appellee admit that neither they nor appellee know what caused the wreck, and says: 'This unique or rather astounding confession explains the lack of theory in the complaint, but does not excuse the action of the court in letting them guess as to the cause.' In this connection let us suggest that there are cases wherein the particular facts and causal circumstances are obscure and where necessarily much is left to inference. In such cases the rule of evidence, res ipsa loquitur, ought to, and in fact does, have its concomitant rule of pleading."

In Vigor v. Chesapeake and O. Ry. Co., supra, the complaint, in addition to charging a violation of the Safety Appliance Act (to which we have referred heretofore), also charged neglect. There the plaintiff contended that negligence was to be inferred under the doctrine of res ipsa loquitur. On page 869 of 101 F.2d, the court said: "However, if it be conceded that the inference in decedent's favor was effectively rebutted, and that appellant was not liable under the statute, yet, under the pleadings and evidence, we think a proper verdict was reached on the theory of appellant's negligence under the doctrine of res ipsa loquitur."

Both sides place emphasis upon Cochran v. Pittsburgh & L. E. R. Co., D. C., 31 F.2d 769. The court in that case makes an exhaustive review of the authorities with reference to the res doctrine, including most of those relied upon by the defendant here. The defendant stresses the following conditions under which the doctrine is applicable, as stated by the court in that case, on page 773 of 31 F.2d: "* * * an inference of negligence will arise from the accident whenever it is alleged or proved that the employee was injured in the course of his employment; that the nature of the accident is such as to make it probable that it was the result of negligence, rather than a pure accident or the act of God; that the agency causing the accident was not under the control of the injured employee, but of the master or other employee, for whose negligence the master is now responsible; that the circumstances render it improbable that there was any other cause than negligence in some form for which the master would be liable; and that it was the kind of accident such as does not ordinarily happen if due care is exercised."

It argues here that plaintiff's decedent was in control of the engine and for that reason the doctrine is not applicable. We do not believe the argument is sound. True, the decedent, as the engineer, had control of the speed of the engine, but he had no more control and was no more responsible for the proper functioning of the pony-truck which caused the accident, than was the fireman, brakeman or conductor. In speaking of the res doctrine, the court in the Cochran case, at page 771 of 31 F.2d, said: "* * * It is a rule which permits or requires an inference of negligence to be drawn from the fact of an accident plus the circumstances which characterize the accident. It is an evidential inference, which will carry a case to the jury, but is not binding upon the jury; indeed, the weight of the inference is oftentimes for the jury, and a court might not be justified in setting aside a contrary verdict, if the jury did not deem the inference sufficient to warrant a verdict in plaintiff's favor; and this no doubt would be true, even though the explanation offered by the defendant might not be adequate or pertinent."

In the instant case, the defendant, by a thorough search and investigation, made every effort to determine the cause of the accident, but without avail. That the accident was unusual, there can be no question, and we think it is probable that it was the result of negligence rather than pure accident. Under such circumstances, the law creates an inference sufficient to carry the case to the jury. We are convinced the verdict should not be disturbed.

The judgment is affirmed.