### O'DONNELL v. ELGIN, JOLIET & EASTERN RY. CO.

No. 9598.

United States Court of Appeals
Seventh Circuit.

Dec. 27, 1948.

Rehearing Denied Jan. 22, 1949.

Joseph D. Ryan and Louis. P. Miller, both of Chicago, Ill., for appellant.

Harlan L. Hackbert, of Chicago, Ill., for appellee.

Before KERNER and MINTON, Circuit Judges, and BRIGGLE, District Judge.

KERNER, Circuit Judge.

Plaintiff-appellant, as administratrix of her deceased husband's estate, brought this action against defendant-appellee under the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., to recover for her husband's death. She charged general negligence under the Act and a violation of the Safety Appliance Act, 45 U.S.C.A. § 2, which provides that "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." Plaintiff tried her case upon the theory that her husband came to his death as the result of the breaking of a coupler. The issues left to the jury were whether defendant violated the Safety Appliance Act and whether such alleged violation was the proximate cause of O'Donnell's death. The jury returned a verdict for defendant, and from a judgment based thereon, plaintiff appealed.

The decedent was a switchman employed by defendant and on the night he met his death was working in defendant's yards at Gary, Indiana. The decedent's brother was the conductor-foreman of a switching crew engaged in making up a train of cars on what was known as Track 5. In this yard the lead tracks and the terminal and rip tracks ran in a general east and west direction. Branching off from these tracks in a northeasterly direction were Tracks 1 to 6. From the latter tracks the switching crew was switching cars out upon the lead tracks. As the cars were sorted out on the leads, they were switched into the proper track. There were some 43 cars in on Track 5, filling it from the west to the east. The last three cars pushed in towards Track 5 did not couple to each other nor to the cut of cars already on that track. One car stood about a car length west of the cut, just at the point where a safety sign had been lowered. It was customary to raise this sign in warning when repairs were being made on the track and to fold it down between the rails when no warning was necessary. The other two cars stood west of the single car. The decedent and his brother were standing along Track 1 near the switch when decedent's brother told decedent he was going to pull some cars from Track 1 onto the lead track; the most easterly of these cars was to be switched into Track 5 and the others into another track. The decedent, in preparation for this movement, went to line up the couplings of the three cars that had not been coupled to the cut of cars on Track 5. This is the last time that he was seen alive.

The decedent's brother started the switching operation to put the car into Track 5. This operation, referred to as the first movement, took four or five minutes. This gave decedent sufficient time to walk to the uncoupled cars on the west end of Track 5 and attend to the lining up of the coupling. The cut of cars in the switching operation moving eastwardly toward Track 5, reached

a speed of ten miles an hour. As it neared Track 5, decedent's brother gave two successive stop signals, but, for some reason not apparent on the record, these signals were not obeyed. The conductor then gave an emergency stop signal, and the cars came to a sudden stop. When the sudden stop was made the coupler on the west end of the second car from the east end of the cut broke, allowing the two easterly cars to run free and collide under their momentum with the uncoupled cars on Track 5. The violent impact coupled the cars in succession as they moved eastwardly until the most easterly car was coupled to the most westerly car of the cut already on Track 5. This indicated that the decedent had by this time properly aligned the couplers as he had set out to do.

Shortly after the breaking of the coupler and the collision, decedent's brother proceeded along the north side of Track 5 eastwardly for about ten car lengths, examining the couplings to see if they had all been properly made. His examination was made by turning the light from his electric lantern upon each coupling as he passed along. In addition to his lantern light, the yard was lighted up by a floodlight from the top of a coal chute to the southeast of Track 5. The floodlight cast the car's shadow towards the north. The cars extended two feet or more out over the rail. When decedent's brother satisfied himself that the couplings were made, he boarded the engine, rode around to the east end of the cut of cars on Track 5, coupled the engine, and moved the cars out east into the terminal yard.

After this movement, referred to as the second movement, decedent's brother returned to the switchmen's shanty and not finding decedent there, went out to the east end of Track 1 looking for him. Not finding decedent at that point, he returned to the shanty. About an hour had elapsed since decedent had been last seen, and his brother became alarmed. Again he went out, searching in the eastern part of the yard as decedent often rode the cars down to the east end when his work in the west part of the yard was completed. The engineer was walking west in the yard when decedent's brother met him and inquired if he had seen decedent. The engineer replied

in the negative, and the two proceeded westwardly along the north side of Track 5 until about 15 car lengths east of the west switch on Track 5. The engineer continued westward along Track 5, and decedent's brother turned north to search again on Track 1. Finding no trace of decedent there, he turned back to Track 5 and proceeded westwardly to about a car length east of the safety sign. The decedent's body was found there, lying north of the north rail, close up against it, the right arm and leg severed on the north rail, and the face cut off. The sign was lying flat between the rails with a fresh chip out of it. His lantern was found at the sign and brush marks continued eastward to the point where the body was found, indicating the body had been dragged eastward from the point of the sign about a car length or the distance of the last gap to be closed by the cars following the crash of the two cars that ran in after the coupler broke.

In her brief plaintiff admits there was no evidence that the coupler had failed to function previous to the accident, and that there was no evidence that defendant had failed to exercise ordinary care in respect to the maintenance of the coupler. Her theory was that decedent had been killed on the first movement when the coupler broke and that that is the only conclusion that could be reached from the facts proved.

On the other hand defendant contends that the jury may have concluded that decedent was killed on the second movement when the cars were pulled eastwardly on Track 5, otherwise decedent's brother would have discoverd the body as he walked along the north side of Track 5 inspecting the couplings after the coupler broke and the two cars had crashed into Track 5; and since it was at least uncertain in which movement decedent was killed, and the jury, having considered the factual situation which was in its province, resolved the findings against plaintiff, the verdict should not be disturbed.

 Thus it is clear that the question was one of fact. The jury is the tribunal to decide that type of issue, Bailey v. Central Vermont Ry., 319 U.S. 350, 353, 63 S.Ct. 1062, 87 L.Ed. 1444, and while the jury was

entitled to draw inferences from the evidence, nevertheless, plaintiff was required to present probative facts from which the negligence and causal relation could reasonably be inferred. Tennant v. Peoria & P. U. Ry., 321 U.S. 29, 32, 64 S.Ct. 409, 88 L.Ed. 520. The choice of conflicting versions of the way the accident happened and the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. Ellis v. Union Pacific R. R., 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572.

In this case we cannot say that the evidence leads only to a conclusion other than that reached by the jury or that the jury reached a verdict that has no basis in the evidence. We are not warranted in setting aside a verdict where there are two versions in the evidence or where the evidence is so uncertain that no definite conclusion can be reached therefrom. To resolve such factual situations is clearly the province of the jury. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916, and United States v. Douglas Aircraft Co., 9 Cir., 169 F.2d 755.

Plaintiff complains of the court's instructions. The court, after instructing the jury that the Safety Appliance Act placed upon defendant the absolute duty to provide couplers coupling automatically by impact and which could be uncoupled without the necessity of men going between the ends of the cars, told the jury that they might find defendant guilty, if they believed that defendant had used and operated a car with a defective coupler, contrary to the provisions of the Act, and that the coupler broke, and that as a direct and proximate result thereof decedent sustained injuries which resulted in his death.

The record is devoid of any request by plaintiff that the jury be instructed that they might infer negligence from the breaking of the coupler, but in the District Court plaintiff contended for and tendered instructions upon the theory that a breaking of the coupler in and of itself was negligence per se. The court refused to so instruct.

While the duty resting upon defendant to furnish couplers that complied with the Safety Appliance Act was abso-

lute, and it has been held that the statute should be liberally construed " 'so as to give a right of recovery for every injury the proximate cause of which was a failure to comply with a requirement of the Act' "; Brady v. Terminal R. R. Association, 303 U.S. 10, 15, 58 S.Ct. 426, 429, 82 L.Ed. 614, we do not believe the Act required defendant to furnish couplers that would not break. We think the true rule is that where a coupler does break, the jury may, if they think it reasonable under all the circumstances, infer that the coupler was defective and was furnished and used in violation of the Act. The cases go no further than to hold that from the breaking of a coupler the jury may infer negligence. New Orleans & N. E. R. R. v. Scarlet, 249 U.S. 528, 39 S.Ct. 369, 63 L.Ed. 752; Minneapolis & St. Louis R. R. v. Gotschall, 244 U.S. 66, 37 S.Ct. 598, 61 L.Ed. 995, and Vigor v. Chesapeake & O. Ry., 7 Cir., 101 F.2d 865. Permitting the jury to infer negligence from the breaking of the coupler with no other proof of negligence, as in the Gotschall case, is a different thing from telling the jury they must find negligence from the breaking of the coupler. It is the difference between leaving the question to the jury and peremptorily instructing the jury to find for plaintiff.

In this connection it might be well to say that we cannot assume that had plaintiff requested that the jury be instructed that they might infer negligence from the breaking of the coupler, that the court would not have so instructed. Rather, we must assume the court would have so instructed. In this state of the record it cannot be said the court erred in refusing the instructions tendered. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 59, 87 L.Ed. 496; Alaska Pacific Salmon Co. v. Reynolds Metals Co., 2 Cir., 163 F.2d 643; Krug v. Mutual Accident Ass'n, 8 Cir., 120 F.2d 296, 301; McDonald v. Jarka Corporation, 2 Cir., 144 F.2d 53, 54; and Blair v. Cullom, 2 Cir., 168 F.2d 622.

Plaintiff next complains of an instruction that told the jury that the fact of an accident carries no presumption of negligence; that the evidence must point to the fact that defendant was guilty of negligence; that they could not guess between the various

causes of the accident and find that the negligence charged was the proximate cause of the accident if there was no satisfactory foundation for such a conclusion. The objection is that this instruction required plaintiff to prove negligence apart from and in addition to the breaking of the coupler. Plaintiff says that this instruction confuses defendant's negligence with causal relation, or proximate cause, and directs the jury to guess and conjecture that there was no satisfactory foundation for the conclusion that the breaking of the coupler caused or proximately contributed to cause O'Donnell's death.

It is to be remembered that all the instructions must be considered together as one charge. The criticized instruction is directed to the question of proximate cause. It correctly cautioned the jury that they could not presume from the fact of the accident that O'Donnell was killed because of the breaking of the coupler. Brady v. Southern Ry., 320 U.S. 476, 483, 64 S.Ct. 232, 88 L.Ed. 239.

Moreover, upon examination of all the instructions given, we find that the court correctly explained to the jury, the issues and the law applicable thereto. He told the jury that if they found the coupler did not comply with the requirements of the statute and that as a result O'Donnell had been killed in the movement which followed, they could find defendant guilty. He distinctly and in express terms called attention to the three grounds of liability charged, and the statutes involved. He defined negligence, proximate cause, the preponderance of the evidence and instructed them as to the limited extent to which contributory negligence entered into the issues. Under these circumstances we do not believe that the instructions considered as a whole were erroneous.

The judgment of the District Court is affirmed.

MINTON, Circuit Judge (concurring in part and dissenting in part).

I concur in so much of the opinion as does not deal with the instructions. I think the instructions confused the jury and did not fully and correctly state the law. One cannot read this record, it seems to me, without reaching the conclusion that the evidence clearly preponderated in favor of the plaintiff, and the instructions misled the jury to a wrong result. I think the jury was confused and misled by the instructions into believing it could not infer negligence from the breaking of the coupler but had to find that the breaking of the coupler was a question of whether the defendant had used reasonable care in and about the furnishing and use of the coupler which broke. If the coupler broke, that under the circumstances might authorize the jury to infer negligence from the violation of the Safety Appliance Act.

The plaintiff made the following timely objections to the court's instructions:

"Your Honor, the first thing I wish to suggest is this, that a violation of the Safety Appliance Act is in and of itself negligence. * * *"

The court gave the following instruction:

"Now, if you believe from a preponderance of the evidence, and I will tell you what that means in a little while, under the instructions of the Court, that the defendant, at the time and place in question, used and operated a car with a defective coupler, contrary to the provisions of the Federal Safety Appliance Act, and that said coupler broke, and that as a direct and proximate result thereof, the plaintiff's decedent sustained injuries which resulted in his death, then you may find the defendant guilty."

While this instruction was substantially as requested by the plaintiff, it did not quite meet the plaintiff's request that the court instruct directly and positively that a violation of the Safety Appliance Act was negligence in and of itself. Since the plaintiff's exception to the court's instruction was a request that the court instruct fully on one of the most important legal questions in the case, the court should have complied with the plaintiff's specific request.

Not only should the court have specifically instructed that a violation of the Safety Appliance Act was in and of itself negligence without regard to the use of reasonable care, but the court should have further instructed the jury that it may infer negli-

gence from the breaking of the coupler. Minneapolis & St. Louis R. R. v. Gotschall, 244 U.S. 66, 37 S.Ct. .598, 61 L.Ed. 995. To this failure to instruct, the plaintiff, however, did not object. I am aware that under Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., and the well-settled federal practice, an instruction is precluded from review on appeal unless the party urging review has objected thereto before the jury has retired and has stated "distinctly the matter to which he objects and the grounds of his objection." United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555; Krug v. Mutual Accident Ass'n., 8 Cir., 120 F.2d 296. Although neither side requested the Court to instruct the jury that it might draw an inference of negligence from the mere breaking of the coupler and the plaintiff did not object that such an instruction, which is the correct rule governing.this case, was not given, I do not think, under the circumstances here presented, that Rule 51 requires us not to notice this omission. The breaking of the coupler is the fact which raises the most important question of law in this case. The plaintiff timely and distinctly objected to the court's failure to instruct that the breaking was in and of itself negligence. While this objection was predicated upon an incorrect conception of the law, it was sufficient to direct the attention of the court and place it under duty to instruct on the law properly applicable to this crucial fact. Memphis Press-Scimitar Co. v. Chapman, 6 Cir., 62 F.2d 565.

The court gave the following instruction to which the plaintiff did properly object:

"Now, as I have told you in the beginning, the fact of an accident carries with it no presumption of negligence on the part of the defendant. That is an affirmative fact for the plaintiff to prove. Plaintiff must prove that the defendant has been guilty of negligence as alleged in the plaintiff's complaint, one of these three things that I have been enumerating to you. It is not sufficient for the plaintiff to show that the defendant may possibly have been guilty of negligence."

This instruction, given in a case where only common law negligence is considered, may be appropriate, but such principle is held "not controlling in view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars." Minneapolis & St. Louis R. R. v. Gotschall, supra, 244 U.S. at page 67, 37 S.Ct. 598, 61 L.Ed. 995.

Webster defines "presumption" as:

* * *

"That which is presumed, or supposed or believed on evidence that is probable, but not conclusive * * *.

"An inference as to the existence of one fact not certainly known from the known or proved existence of some other fact, founded on a previous experience or general knowledge of their connection * * *." Webster's New International Dictionary, Second Edition, Unabridged.

The common definition of presumption is the equivalent of inference. The court's instructions, in effect, told the jury that it could not infer negligence from the happening of the accident, namely, the breaking of the coupler. Instead of instructing the jury that it might infer negligence from the breaking of the coupler, the court told the jury it could not infer negligence from the happening of the accident. This was error. Two kinds of negligence were charged in the complaint, namely, the general charge of a failure to use due care and the violation of a statute. To give the latter instruction without strictly limiting it to the general charge of negligence was calculated to mislead the jury in its right to infer negligence from the breaking of the coupler and thus find a violation of the Safety Appliance Act. This was a jury question under all the authorities.

For failure of the court to instruct the jury fairly and fully, the judgment of the District Court should be reversed.