## BAILEY, ADMINISTRATRIX, *v.* CENTRAL VERMONT RAILWAY, INC.

No. 640. Argued April 13, 1943.—Decided May 24, 1943.

*Mr. Joseph A. McNamara,* with whom *Messrs. Robert W. Larrow* and *T. Tracy Lawson* were on the brief, for petitioner.

*Mr. Horace H. Powers* for respondent.

Mr. Justice Douglas delivered the opinion of the Court.

This action was brought under the Federal Employers Liability Act (45 U. S. C. § 51) in the state courts of Vermont to recover damages for the death of Bernard E. Bailey, one of respondent's employees. At the close of all the evidence respondent moved for a directed verdict. The court denied the motion and submitted the case to the jury which returned a verdict for petitioner. On appeal the Supreme Court of Vermont reversed, by a divided vote, holding that the motion for a directed verdict should have been granted because negligence was not shown. 113 Vt. 8, 28 A. 2d 639. The case is here on certiorari.

Bailey had worked for respondent as a sectionman for about five years. On the day in question—May 14, 1940—he went to work on a work train to a point on the road in Williston, Vt., where he and other members of the crew unloaded track material to be used on the roadbed. Instructions were then received to unload a car filled with cinders. The evidence of the accident viewed in a light favorable to petitioner was as follows:

The car was pulled onto a bridge over a cattle pass so that the cinders could be dumped through the ties in the bridge floor onto the roadway below. The floor of the bridge was about 18 feet above the ground. The only available footing at the side of the car was about 12 inches wide. Of this space 8 or 9 inches were taken up by a raised stringer, i. e., a timber which lay across the ties and was set in 3 or 4 inches from their ends. There was no guard rail. The cinders to be unloaded were in a hopper car. That type of car has doors in the floor which are closed by a chain which winds up on a shaft running crossways of the car. The doors are opened from the side by one man turning a nut on the end of the shaft while another disengages from a ratchet a dog which holds the shaft. A wrench is applied to the nut at the end of the shaft, the operator pulls its handle back to relieve the tension on the dog, the other person releases the dog, the operator of the wrench pushes back on it to open the hopper, and the weight of the material in the car opens the doors. When the hopper starts to open, the shaft spins, and the operator must disengage the wrench or let go of it, lest he be thrown off balance or knocked down. The wrench used by Bailey was a heavy frog wrench—open jaws and a handle about three feet long. It had been used for many years for that purpose and no one had been injured by it. Bailey certainly was unskilled and perhaps unfamiliar in the opening of hopper cars. No one had ever seen him open one. Such an operation was usually

performed by men older in point of service. Bailey had been present on a few occasions when hopper cars were unloaded but usually he was on top of the car at the time. Cinders were dumped at this bridge about once a year. As Bailey walked out on the stringer on the bridge and put the wrench on the nut, the section foreman said, "Be careful the wrench doesn't catch you." Bailey at once pushed on the wrench but the hopper did not open; he gave another push on the wrench, the hopper opened, the nut spun, and Bailey was thrown by the wrench into the roadway below. The hopper car could have been opened before it was moved onto the bridge and any cinders which spilled on the roadbed shoveled onto the roadway beneath the bridge. Or after the cinders had been dumped upon the roadbed a railroad tie could have been utilized as a drag to push cinders from the roadbed to the ground below the bridge.

Bailey died from the injuries resulting from the fall.

There was in our view sufficient evidence to go to the jury on the question whether, as alleged in the complaint, respondent was negligent in failing to use reasonable care in furnishing Bailey with a safe place to do the work.

Sec. 1 of the Act makes the carrier liable in damages for any injury or death "resulting in whole or in part from the negligence" of any of its "officers, agents, or employees." The rights which the Act creates are federal rights protected by federal rather than local rules of law. *Second Employers' Liability Cases,* 223 U. S. 1; *Seaboard Air Line Ry.* v. *Horton,* 233 U. S. 492; *Chesapeake & Ohio Ry. Co.* v. *Kuhn,* 284 U. S. 44. And those federal rules have been largely fashioned from the common law (*Seaboard Air Line Ry.* v. *Horton, supra*) except as Congress has written into the Act different standards. *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54. At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain. 3 Labatt,

Master & Servant (2d ed.) § 917. That rule is deeply engrained in federal jurisprudence. *Patton* v. *Texas & Pacific Ry. Co.,* 179 U. S. 658, 664, and cases cited; *Kreigh* v. *Westinghouse & Co.,* 214 U. S. 249, 256, 257; *Kenmont Coal Co.* v. *Patton,* 268 F. 334, 336. As stated by this Court in the *Patton* case, it is a duty which becomes "more imperative" as the risk increases. "Reasonable care becomes then a demand of higher supremacy, and yet in all cases it is a question of the reasonableness of the care—reasonableness depending upon the danger attending the place or the machinery." 179 U. S. p. 664. It is that rule which obtains under the Employers Liability Act. See *Coal & Coke Ry. Co.* v. *Deal,* 231 F. 604; *Northwestern Pacific R. Co.* v. *Fiedler,* 52 F. 2d 400; *Thomson* v. *Boles,* 123 F. 2d 487; 2 Roberts, Federal Liabilities of Carriers (2d ed.) § 807. That duty of the carrier is a "continuing one" (*Kreigh* v. *Westinghouse & Co., supra,* p. 256) from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent.

The nature of the task which Bailey undertook, the hazards which it entailed, the effort which it required, the kind of footing he had, the space in which he could stand, the absence of a guard rail, the height of the bridge above the ground, the fact that the car could have been opened or unloaded near the bridge on level ground—all these were facts and circumstances for the jury to weigh and appraise in determining whether respondent in furnishing Bailey with that particular place in which to perform the task was negligent. The debatable quality of that issue, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue (*Tiller* v. *Atlantic Coast Line R. Co., supra*) as well as issues involving controverted evidence. *Jones* v. *East Tennessee, V. & G. R. Co.,* 128 U. S.

443, 445; *Washington & Georgetown R. Co.* v. *McDade,* 135 U. S. 554, 572. To withdraw such a question from the jury is to usurp its functions.

The right to trial by jury is "a basic and fundamental feature of our system of federal jurisprudence." *Jacob* v. *New York City,* 315 U. S. 752. It is part and parcel of the remedy afforded railroad workers under the Employers Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them.

Since the evidence of respondent's negligence in failing to provide Bailey with a safe place to work is sufficient to support the verdict of the jury and the judgment of the trial court, we do not reach the other issues which have been presented by petitioner.

*Reversed.*

MR. JUSTICE ROBERTS:

I am of opinion that this case is one of a type not intended by Congress to be brought to this court for review. Actions under the Federal Employers Liability Act constitute but one category of the great total of actions triable in federal district courts and in the courts of the forty-eight states which may come to this court. While the legal principles binding alike on court and jury in such actions are, for the most part, settled, the complexes of fact to

which these principles are applicable rarely are identical in any two litigations. If, in every case where, peradventure, this court might differ from a lower court in appraising the legal effect of the proofs adduced by plaintiff or defendant, we independently review the facts to determine whether there was evidence for a jury's consideration, we shall reverse a course founded in over fifty years of history.

While a litigant has no constitutional right of appellate review, Congress has seen fit to grant it. And, until 1891, this court was, with negligible exceptions, the only instrument of such review. The increasing volume of our appellate work bade fair to render the court incompetent to give needed consideration to important cases which the public interest required that it decide. To preserve the privilege of appellate review, and to provide an appellate tribunal where most federal litigation should end without resort of this court, Congress created the Circuit Courts of Appeals.[1] The relief thus afforded this court prevented the substantial break-down of our appellate function. But the relief proved insufficient, and Congress continued to adopt means to render it possible for us to do the indispensable work of the court. In 1915 it made the judgments of Circuit Courts of Appeals final in certain classes of cases arising in Puerto Rico and Hawaii, and also in bankruptcy cases, subject, as to the latter, to our discretionary power to take cases involving important questions.[2] The House Committee in its report said as to the objects of the bill:[3]

"Relieving the Supreme Court of the United States from the necessity of reviewing such cases from the Supreme Courts of Porto Rico and Hawaii as involve no Federal question, but depend entirely upon the local or general

---

[1] Act of March 3, 1891, 26 Stat. 826.

[2] Act of January 28, 1915, 38 Stat. 803.

[3] H. Rep. No. 1182, 63d Cong., 2d Sess.

law.  Under the law as it now stands the decisions of the
Supreme Courts of Porto Rico and Hawaii are reviewable
by the Supreme Court of the United States not only when
some Federal right is in controversy, but also in all cases
which involve more than $5,000, without respect to the
character of the questions involved.  This section as
amended includes Porto Rico with Hawaii and continues
the existing right to review in the Supreme Court when
Federal rights are in controversy, but leaves all other cases
to be dealt with upon a petition for a writ of certiorari, as
is now the law with respect to most of the cases in the cir-
cuit court of appeals."

The great mass of litigation in state and federal courts
arising under the Employers Liability Act and railway
safety appliance legislation still could be brought to this
court as of right under existing law.[4]   In 1916 Congress
abolished the right and made the judgments of state ap-
pellate courts and Circuit Courts of Appeals final in this
class of cases, subject to our discretionary review.[5]   The
Senate Committee report on the bill was entitled "Relief
of the Supreme Court," and to it was appended a memo-
randum prepared by the clerk of this court exhibiting the
congested state of our docket.[6]   Finally, in 1925, Congress
dealt in the same fashion with all litigation sought to be
brought here for review from state and federal tribunals,
save for certain narrowly restricted classes.[7]

Without the benefit of this restriction of its obligatory
jurisdiction this court could not have attained the end and
aim of its creation.  But there remains the constant
danger that, by taking cases lying outside defined areas

---

[4] *Southern Ry. Co.* v. *Crockett,* 234 U. S. 725.

[5] Act of Sept. 6, 1916, c. 448, 39 Stat. 726, § 3.  See *Andrews* v. *Vir-
ginian Ry. Co.,* 248 U. S. 272.

[6] S. Rep. No. 775, 64th Cong., 1st Sess.  See also the House Report
No. 794, 64th Cong., 1st Sess.

[7] Act of February 13, 1925, 43 Stat. 936.

of importance, the court will limit its ability adequately to deal with those which all will agree it must adjudicate.

And so the policy of the court has been to abstain from taking a case even though it thought it erroneously decided below, whether on an issue of law or fact, if the decision did not involve an important question of law, did not create a diversity of decision in lower courts, or would not seriously affect the administration of the law in other cases. And this has been especially so where a decision below recognized the controlling legal principles but was claimed to have applied them improperly to the specific facts disclosed. The instant case plainly belongs in the class last mentioned. All members of the Supreme Court of Vermont agreed upon the controlling legal rule. They sharply and almost evenly divided on the question whether the plaintiff's evidence brought her case within that rule. What they decided, and what we decide, can add nothing to the body of jurisprudence. And it is irrelevant to the question of our exercise of the power of review that if we had been charged with the responsibility of a trial judge or a member of the court below, we might have held the case one for submission to a jury.

In almost every litigation, the parties are afforded hearings in at least two courts. This was true here, the appellate court being the supreme court of the state of the parties' residence. If, in such a case, we accord a third hearing, whenever we should have applied the law differently, we shall have little time or opportunity to do aught else than examine the claims of plaintiffs and defendants that, in the special circumstances disclosed, prejudicial errors have been committed in the admission of evidence, in rulings of law, and in charges to juries.

There is no reason why a preference should be given, in these respects, to actions instituted under the Federal Employers Liability Act, over others founded on other

federal statutes, over contract cases, or admiralty cases, where a failure properly to rule on the facts is asserted to have wrought injury to one of the parties.[8]

It seems to be thought, however, that any ruling which takes a case from the jury, albeit it will not serve as a precedent, is of such paramount importance as to require review here. I merely state my conviction that the Seventh Amendment envisages trial not by jury, but by court and jury, according to the view of the common law, and that federal and state courts have not usurped power denied them by the fundamental law in directing verdicts where a party failed to adduce proof to support his contention, or in entering judgment notwithstanding a verdict for like reason. But this I do say, that this court does not sit to redress every apparent error committed by competent and responsible courts whose judgments we are empowered to review. And, if we undertake any such task, we shall disenable the court to fulfill its high office in the scheme of our government.

Finally, I cannot concur in the intimation, which I think the opinion gives, that, as Congress has seen fit not to enact a workmen's compensation law, this court will strain the law of negligence to accord compensation where the employer is without fault. I yield to none in my belief in the wisdom and equity of workmen's compensation laws, but I do not conceive it to be within our judicial function to write the policy which underlies compensation laws into acts of Congress when Congress has not chosen that policy but, instead, has adopted the common law doctrine of negligence.

MR. JUSTICE FRANKFURTER joins in this opinion.

MR. CHIEF JUSTICE STONE:

I agree with MR. JUSTICE ROBERTS that the present case is not an appropriate one for the exercise of our discretion-

---

[8] See the dissent in *Deputy* v. *Du Pont,* 308 U. S. 488, 499.

ary power to afford a second appellate review of the state court judgment by writ of certiorari. But as we have adhered to our long standing practice of granting certiorari upon the affirmative vote of four Justices, the case is properly here for decision and is, I think, correctly decided.