[Civ. No. 14842.   First Dist., Div. Two.   July 15, 1952.]

ELMER H. TRUITT, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

Hildebrand, Bills & McLeod and D. W. Brobst for Appellant.

Arthur B. Dunne, and Dunne, Dunne & Phelps for Respondent.

GOODELL, J.—Plaintiff, a switchman, sued under the Federal Employers' Liability Act for personal injuries sustained while switching in respondent's yards at Eugene, Oregon. The action was prosecuted on the theory that respondent had not furnished appellant, its employee, a safe place in which to work.

The court granted a motion for nonsuit and from the judgment entered thereon this appeal was taken after a new trial had been denied.

The accident happened on October 12, 1948, about 8 p.m. on an industry track serving the plant of Clements Lumber Company and other lumber concerns situated within the railroad yards. Plaintiff was one of a crew of five, the others being the foreman named Drury, an engineer, a fireman, and a switchman named Buffington. Buffington's duties were closest to the engine while those of plaintiff, called a field man, were farthest therefrom.

The track was used for the loading of lumber and its products. The empties would be "spotted" at intervals along the track and the materials loaded into them by boom, chute, and other methods. When loading was completed the switching crew would return, couple the loaded cars together and pull them out to the main line for despatching to their destinations.

On one side of this track was a wooden loading platform. A contrivance consisting of a ginpole and boom was at the edge of this platform, for lifting and swinging lumber onto the cars. It was rigged with wire cables one of which stretched above the track at a right angle thereto and was at one elevation or another according to the particular operation in which the boom happened to be engaged.

On the other side of the track and at a distance of some

65 feet from the ginpole was a wooden bin equipped with a metal chute which dropped scrap wood into the cars. This chute was about 36 inches wide and 18 inches deep.

The cable extending across the track was sometimes well up above the tops of the cars, giving ample clearance to anyone standing on the roofs thereof, but at other times, including this instance, it was down and stretched only a few feet above the roofs of the boxcars, all depending on the movements of the boom or the way it was left by the lumber company's people after its last operation.

The chute occasionally was elevated, well in the clear, but generally it was down. When down it overhung the roofs of boxcars or automobile cars (which are boxcars but larger than ordinary ones) by about 30 inches. On boxcars, running fore-and-aft along the mid-line of the roof, are level wooden runways of a width permitting the trainmen to walk back and forth thereon in doing their work. The overhang of the chute did not reach to, or impinge on, these runways; at its closest point it reached inward to within about 8 inches from the runway's edge and was about 10 inches above the car's roof.

On the night of the accident plaintiff went in on the track with the switching crew for the purpose of pulling out 12 loaded cars which had been "spotted" at intervals at various loading points along the industry track. It was dark and there was no illumination of the area. He carried a lighted lantern for signaling purposes. His job was to see to it that as the cars were shoved together by the engine they were securely coupled. This having been accomplished without incident, and the cars being ready to pull out, he climbed a ladder on the last car of the string (an automobile car) to the runway on its roof, and walked towards its rear end, that is, in the direction away from that in which the cars were traveling. According to measurements taken later that night the cable was stretched about 54 inches above the runway. While the train was moving this cable hit plaintiff and threw him to the roof of the car. While trying to regain his footing he was hit by the overhanging chute and knocked from the roof of the car to the ground, sustaining the injuries for which he sues. It is stated above that the lower end of the chute did not reach closer than about 8 inches toward the edge of the runway. It appears (in reconstructing what occurred) that when knocked down by the cable plaintiff fell or rolled from the runway onto the roof of the car on the side of the overhanging chute. He was

found lying on the ground just under the chute. The distance along the track from the loading boom and its cable to the wood bin and its chute is about 65 feet. *Thus he was hit twice because of two impaired clearances in that short distance.*

When the crew searched for plaintiff he was found on the ground beside the track, "draped" around the ladder attached to the wood bin. He was dazed and unconscious to the extent that he failed to identify his crew mates as they came to the rescue. He was very seriously injured.

The record shows that the track in question was uneven, laid on a sawdust roadbed, and one witness testified that in 40 feet of track there would be only one or two good ties. The result was that as the cars passed over this area of respondent's yards they would rock and sway. The loading platform was so close to the track that it, and the lumber piled on its edge, constituted a serious hazard as the cars swayed and rocked. For this reason the switchman could not safely hang onto the side of the car, grasping a handhold and with foothold in stirrup (as is usual in switching) for fear of being crushed, but had to go onto the roof of the car for his own safety. Thus the plaintiff when injured was on the roof of a car traveling on an uneven track, in the dark, with a wire cable stretching across the track a few feet above the roof's runway and a large metal chute overhanging the roof which was supposed to afford him a safe place to work.

A complaint as to the impaired clearance of the chute had been made by plaintiff within 10 days or two weeks preceding the accident. Plaintiff had "reported the wood chute bearing down too low" to Assistant Yardmaster Koenig one afternoon while awaiting orders, and on another occasion a few days before the accident, sometime in September, "there was five of us," said plaintiff, "wrote up some blank and signed it and gave it to him." Plaintiff testified: "it is part of the business of every man, whether he is on the switch crew or what he is doing, to continually report any unusual or dangerous condition . . . every man that works on the railroad is a kind of an inspector," and it is one's duty "to watch out for and inform yourself about impaired clearances." Rule 2060 was read into evidence as follows: "Keep informed as to location and nature of impaired clearances to avoid being struck or injured."

John E. Buffington, the other switchman on the crew, testified that several times prior to the accident he "had complained to [Koenig] the yardmaster about this wood chute

not being safe," and that the lumbermen were not pulling up the chute when they quit work; that he also complained to Koenig respecting the loading boom that "There was a weight or a down-pull, or something, that it was hanging over the foot path."

F. J. Drury, foreman of plaintiff's crew, testified respecting the chute: "We complained to the assistant yardmaster to have it raised. They said they would have it taken care of, *and that is all they done.*" (Emphasis added.) He testified further: "what time I was on the job I complained to Yardmaster Koenig at different times, probably every day, because we were always unhappy about that . . . We had different complaints. We were always arguing there with the yardmaster about it, to try to get him to correct it." The chute, Drury said, "was one of the main things we always complained to the assistant yardmaster about."

Two other witnesses, Chapman and Hofdahl, were called by plaintiff but most of their proffered testimony was not admitted. This is discussed later.

Taking, then, only the testimony of Truitt, Drury and Buffington, and you have not only ample evidence of the accident itself, showing two major impairments of clearance within a distance of about 65 feet of track, but evidence of complaints to yard authorities made by crew members within two weeks or so preceding the accident.

It must be conceded that the record contains more evidence of complaints as to the impaired clearance of the overhanging chute than as to that of the wire cable stretched above the track. At the same time, however, it appears that the trial judge was convinced that the respondent had notice of the cable hazard, from his remark that "It is conceded that this situation existed several times, *and they had notice of it,* but were they bound to operate that mechanism out there?" (Emphasis added.) Apparently where he fell into error was in assuming—contrary to the fact—that respondent had notified its lessee, the lumber company, of the dangerous situations.

What, then, was the legal duty of respondent, possessed, as it was, of notice of both unsafe conditions? Certainly it could not ignore the complaints which had put it on inquiry, and do nothing at all without being chargeable with negligence. In the face of such a showing it was incumbent on respondent to prove that it had taken some action toward the removal of the unsafe conditions. Its own rules called for *some* action although not too much. Rule 1094

went into evidence without objection, respondent's counsel remarking at the time that it was "the only one that would apply." It reads: "Where occupants of company property under lease encroach upon standard clearances with buildings, lumber, coal piles or other obstructions, they must be courteously notified to comply with standards." Just what communications, if any, respondent had with the lumber company of course do not appear since no defense evidence was before the court. The record as it stands fails to show any communication at all from respondent to its lessee, or any compliance by respondent with its own rule 1094 requiring a courteous notification to its lessee. That being so there is no need to decide whether such notification, if given, would have met the full measure of respondent's legal duty. It is extremely doubtful, we think, that it would have done so.

The record shows that the court was laboring under a misapprehension of the facts. During the colloquy between court and counsel respecting Hofdahl's testimony they were discussing "the condition of allowing the cable to be lower than a safe height, where it would imperil the men working there." The court then said: "The evidence is to the contrary in this case, because the day before the cable was in proper place, and men rode under it without any trouble, according to your own [plaintiff's] testimony in this case. What happened a few weeks before, *I think the people who were responsible for that cable were notified and it had been corrected, apparently.*" (Emphasis added.) To this plaintiff's counsel immediately replied: "It had not been corrected, your Honor." Counsel was right. There was no evidence whatever either that "the people who were responsible for that cable were notified" or that "it had been corrected." That the judge continued under this misapprehension is indicated by his remark shortly before granting the nonsuit, to wit, that plaintiff's case was "against the people who operated the boom and who were responsible for the condition up there, but I don't think it is the Southern Pacific Company . . . *they have done their duty when they notify these people to correct the situation.*" (Emphasis added.) This was the judge's second erroneous assumption that respondent had notified the lumber people, and it probably accounts for his ultimate ruling.

There is not only no testimony that the situation had been corrected, but the position of both cable and chute at

the time of the accident was *some* evidence that it had *not* been corrected. Moreover, Drury's testimony that "They said they would have it taken care of, and *that is all they done*" (emphasis added) must, of course, be taken as true on the motion for nonsuit. Hence on plaintiff's own case there was some evidence that respondent had done nothing at all.

With no evidence whatever that respondent had notified the lumber company of the dangerous conditions or had taken any action toward removing them, it can hardly be said that a *prima facie* case of negligence was not made out.

Since on this record respondent did not even meet the terms of its own self-imposed rule 1094 requiring notice to its lessee, nor the minimum duty stated by the trial judge under his mistaken assumption that respondent had notified "these people to correct the situation," there is no need for us to volunteer an opinion as to *what might have been* respondent's legal duty in the event it had notified its lessee and the lessee had taken no corrective action. Such question is not before us.

Respondent's duty to inspect, discussed in the briefs and by the court is rendered of no consequence because of the complaints lodged by Truitt, Drury, Buffington and the 5-man round robin. Had inspections been made *at times when the cable and chute were down, in dangerous positions* (we emphasize this), they would have disclosed no more, but perhaps even less, than the company had learned from the trainmen who themselves were constantly at work there. No inspection, by whomsoever made, could have developed more first-hand information than that supplied by the men who were directly up against the hazards from day to day. Respondent brought out on the cross-examination of plaintiff that "every man that works on the railroad is a kind of an inspector." The complaints turned in by the switching crew were not only in obedience to this rule, but they were made by men whose lives were being jeopardized by these selfsame impaired clearances. As the record stands now, respondent did nothing about them. Inspection, then, is not a real factor in the case.

As already indicated, the court refused to admit certain proffered testimony of plaintiff's witnesses Chapman and Hofdahl directed to the question of complaints to respondent. Plaintiff contends that the court erred in excluding this testimony. It is extremely difficult to pass upon these rul-

ings, because of the condition of the record covering the discussion between court and counsel at the time. There were several interruptions and some of the tenders were not pressed to a clear-cut issue. It is sufficient to state, as we do presently, our views with respect to admissibility in the light of a new trial.

J. R. Chapman, a yard man, employed by respondent since 1925 at Eugene, was also local chairman of the Brotherhood and it was his function to handle the grievances of the yard men. When asked if any complaints had been made to respondent about the cable and gin-pole prior to the accident respondent objected on the ground of hearsay and the court ruled: "I cannot see how the company would be bound by his testimony, if somebody told him that he made a complaint." Finally he was asked whether he had discussed the cable with Swierski, who was general yardmaster, and answered that as local chairman for the yard men he had done so 15 or 20 days before the accident because "One of the yard men called me between 8 and 9 o'clock one night" and Chapman talked to Swierski the next morning at the latter's office. When asked for the conversation there was an objection based on hearsay and the court ruled that "Unless you can connect it up with the fact that the same condition existed at that time as existed at the time of the accident, and that nothing was done about it, I think the testimony is incompetent." Plaintiff then made the following offer of proof, which was rejected: "I propose to show by this witness that that cable had been left in that condition before, and that that matter was called to the attention of the Southern Pacific Company officials and that they did nothing about it. That is the purpose of this witness, and that is the purpose of the proof . . ."

It then developed that Chapman's complainant was one Ray Hofdahl, who was flown down from Eugene, and was in court the next morning. The nonsuit proceedings were reopened for his testimony. He was prepared to testify, as indicated by the following tender on behalf of plaintiff: "We will bring out from this man's own experience the fact that he was almost knocked down by the cable himself, and he told me he told the company about it. He also told Mr. Chapman who was the man who took the complaints to the company, so that the yardmaster knew the condition that prevailed there." The pending question was withdrawn

but it was during this colloquy that the court said: "I think the people who were responsible for that cable were notified and it has been corrected, apparently."

The fact remains that Hofdahl's testimony was largely curtailed by the court. ■ In view of the necessity for a new trial it is sufficient to say this with respect to the testimony of Chapman and Hofdahl: If Hofdahl can testify that within a reasonable time prior to the accident he had been almost caught on top of a car by the same cable (or, for that matter, had simply seen it in a dangerous position) and had lodged his grievance with Chapman, the recognized "griever" for the employees, and it appeared that Chapman had relayed it on to Swierski or Koenig, the evidence of both Hofdahl and Chapman will be admissible to prove that respondent had been charged with notice respecting the cable. The evidentiary chain would be unbroken and complete. No serious question of Chapman's agency would be involved since on the question of notice to the company any safety-conscious passer-by, or even a trespasser, could have dropped in at the yard office and reported the dangerous condition to anyone in charge and that could have been proved by the passer-by without any doubt. On a new trial plaintiff will be entitled to lay this evidence before the jury by both Hofdahl and Chapman.

In the course of one of the colloquies plaintiff's counsel said: "Incidentally, I would like to introduce in evidence this whole lease agreement. Counsel read part of it in his opening statement, but I would like to introduce the rest of it, particularly paragraph 6, which has to do with the breach of the terms and conditions on the part of the lessee." Thereupon the court said: "Wait a minute, gentlemen. We are getting into difficulty here." The jury was then excused and the discussion continued but there was no further mention of the lease. The tender of the lease apparently got lost in the shuffle and was never ruled on.

■ We assume that the lease in question was one from respondent to Clements Lumber Company, since admittedly the industry track serving Clements was within the limits of respondent's Eugene yards. If so, it would appear that on a new trial the lease will be clearly admissible if paragraph 6 or any other part of it relates to the duties of the parties thereto respecting clearances or dangerous obstructions, or otherwise bears upon the present controversy.

Section 51 of title 45, United States Code Annotated reads: "Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting *in whole or in part* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." (Emphasis added.)

In *Bailey* v. *Central Vermont R. Co.*, 319 U.S. 350, 354 [63 S.Ct. 1062, 87 L.Ed. 1444, 1448], the court said: "The right to trial by jury is a 'basic and fundamental feature of our system of federal jurisprudence.' [Citation.] It is part and parcel of the remedy afforded railroad workers under the Employers' Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to apply those standards to the facts of these personal injuries. . . . To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them."

In *Blair* v. *Baltimore & Ohio R. Co.*, 323 U.S. 600, 604 [65 S.Ct. 545, 89 L.Ed. 490, 494] the court followed the Bailey case and said: "We think there was sufficient evidence to submit to the jury the question of negligence posed by the complaint. The duty of the employer 'becomes "more imperative" as the risk increases.' *Bailey* v. *Central Vermont R. Co.*, 319 U.S. 350, 352, 353, 87 L.Ed. 1444, 1446, 1447, 63 S.Ct. 1062. See, also, *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U.S. 54, 67, 87 L.Ed. 610, 617, 63 S.Ct. 444, 143 A.L.R. 967. The negligence of the employer may be determined by viewing its conduct as a whole. *Union P. R. Co.* v. *Hadley*, 246 U.S. 330, 332, 333, 62 L.Ed. 751, 754, 755, 38 S.Ct. 318. And especially is this true in a case such as this, where the several elements from which negligence might be inferred are so closely interwoven as to form a single pattern, and where each imparts character to the others."

■ If "The duty of the employer 'becomes "more imperative" as the risk increased'" and if "The negligence of the employer may be determined by viewing its conduct as a whole," then the instant case is a striking example of both propositions. Here there was a compound impaired clearance situation, the second accident happening within a second or two after the first—a case if ever there was one,

where "several elements" were "so closely interwoven as to form a single pattern." Abundant and substantial evidence shows that respondent had been fully cognizant of the dangerous situation for some time preceding the accident and, as far as this record shows, had done nothing whatever toward removing the dangers. In our opinion the court erred in granting the nonsuit.

The judgment is reversed.

Nourse, P. J., and Jones, J. pro tem., concurred.

A petition for a rehearing was denied August 14, 1952, and respondent's petition for a hearing by the Supreme Court was denied September 12, 1952. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.