stand.   Accordingly I dissent from the order denying rehearing.

Judge HASTIE also dissents and joins in so much of this opinion as concerns the application of the doctrine of clean hands.

**Byron BORGEN, Appellant,**

v.

**RICHFIELD OIL CORPORATION,**
**Appellee.**

**No. 15862.**

United States Court of Appeals
Ninth Circuit.

June 23, 1958.

Charles H. Warren, Bodle & Fogel, Los Angeles, Cal., for appellant.

Gordon K. Wright, Lillick, Geary, Mc-Hose, Roethke & Myers, Los Angeles, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and CLARK, District Judge.

BARNES, Circuit Judge.

Appellant (sometimes herein referred to as plaintiff) sought damages in the court below for personal injuries allegedly suffered while employed as a seaman aboard the vessel S. S. David E. Day, a T–2 oil tanker owned by defendant corporation.   Plaintiff relied on two causes of action—the first based on the alleged negligence of the appellee (46 U.S.C.A. § 688, commonly known as the Jones Act) and the second, in admiralty, based upon alleged unseaworthiness.   There was diversity of citizenship (28 U.S.C. § 1332).

The trial was held before a jury, and at the conclusion of appellant's evidence, appellee moved, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C., for dismissal of appellant's action on the ground that, upon the facts and the law, the appellant had shown no right to relief.   Appellee's motion was granted and the Court's Order of Dismissal entered.   Rule 41(b) provides that a dismissal upon the ground set forth operates as an adjudication upon the merits.   Appeal from final decisions of the District Courts is vested in the Court of Appeals by 28 U.S.C. § 1291.

Plaintiff's alleged injuries occurred on November 11, 1955, sometime in the early morning hours, when plaintiff slipped and fell on the wet forecastle deck of the David E. Day.   The vessel had just been made fast to the dock at Port St. Johns, Portland Harbor, in the Columbia River. The weather was foul.   There had been

intermittent flurries of rain, and snow which had melted as it hit the steel deck. The forecastle deck was cambered from the center of the ship to the rails and sloped from fore to aft. The plaintiff was wearing shoes with neopreme non-skid sole and heels. It was dark on deck, that is, there were no lights there, although the running lights were probably on and there was some light from the dock.

The steel deck was made of plates which had been chipped of previous paintings to the metal, four or five coats of a preservative applied, and a final coating of what was referred to variously as "deck red enamel," or "deck red paint." This produced a finish that was a "semi-gloss," not a "high-gloss."

After establishing the nature of the deck surface as above outlined, plaintiff produced three master mariners as expert witnesses—Hanson, Amavisca and Wheeler—each of whom testified in effect that it was in their opinion necessary to use either a non-skid paint or paint sanded while wet in those areas on any ship where the crew was required to frequently walk or work, which weather or cargo conditions might make slippery. Within such areas they included the forecastle head on T–2 tankers.

Hanson testified that in his experience the boats on which he worked "always" had either the non-skid paint or the sanded paint;[1] that this "was the common practice among the maritime industry * * * generally,"[2] and the tanker industry specifically.[3] Amavisca testified sand was used on his ships from 1946 on and *either* non-skid paint or sand from 1948 or 1949 on.[4] Wheeler testi-

[1]. "The Court: On these tankers on which you served, where you were the mate or the captain, was there any time when either a nonskid or sand wasn't used?

"The Witness: Yes. On the bulkheads and other places.

"The Court: I am. talking about this particular part of the boat.

"The Witness: No. Where the people walk, like on the main deck and the forecastle head deck and the bridge deck under the risers, where they connect the hose, paint was sprinkled there—I mean sand was sprinkled there.

"The Court: It is your testimony that during the period of your experience upon oil tankers, the boats on which you worked always had either nonskid paint or paint with sand on it?

"The Witness: Paint with sand on it, yes.

"The Court: In the forecastle?

"The Witness: Yes.

"The Court: Or on the forecastle.

"The Witness: On the forecastle." [Tr. p. 61.]

[2]. "Q. By Mr. Warren: Captain, is it true that generally the common practice among the maritime industry with respect to tankers has been that the deck, particularly the forecastle head deck, has been prepared in the manner in which you have testified? A. They have, yes." [Tr. p. 63.]

[3]. "Q. Captain Hanson, I believe you concluded with the statement that in your experience it is common practice among the tanker industry to use some type preparation such as this Devoe & Raynolds nonskid or, alternatively, sand in the upper or last layer of paint on all forecastle head areas, is that right, sir? A. Yes, sir." [Tr. p. 64.]

[4]. "Q. Captain, are you familiar with the manner in which the forecastle head of tankers is kept and maintained? A. Well, that one there, of course, is typical of a T–2.

"Q. You are referring to that diagram on the blackboard? A. Yes, sir. Well, I will say my procedure has always been that due to the fact of all the spills that they would have, and due to the fact there is such a camber and such an angle on the forecastle head, it is slippery at its best, that I discovered quite a while ago it was best, when I first was trying to experiment, test out sawdust, and so forth, and then we stumbled onto sand, and this was in 1946 that we started using the Celilo.

"The Court: What is that?

"The Witness: That is the name of the tanker. So I was using that until about 1948 or 1949, I can't remember exactly, when I came across this non-skid paint, and then I started using the nonskid paint whenever I had it, and when I would run out of it, I would use the sand again. [Tr. pp. 81–82.]

* * * * *

"Q. During the time you sailed prior to November 11, 1955, are you familiar with the general custom and practice·

fied that on the tankers he had sailed he sanded [5] or saw others sand [6] the forecastle head.

Appellant also introduced into evidence four steel plates [7] which showed the nature of the surface after there had been applied (a) a preservative, such as red lead, (b) red lead plus deck paint, (c) red lead plus deck paint with sand, (d) red lead plus non-skid paint. They obviously demonstrated differing resistance to motion between their surfaces and bodies in contact with those surfaces.

Appellant in this Court takes the position that because of the evidence outlined above, the failure of defendant to use either non-skid paint or sand on the wet paint placed on the steel forecastle deck raised a question of fact to be determined by the jury as to whether such failure constituted negligence or created an unseaworthy condition.

Appellee urges that there was no proof that any other seaman had ever been caused to slip and fall because of the deck as it was then painted; that the plaintiff had been in this work as a seaman for a year and on this boat for over a month, and had neither slipped on nor complained of a slippery condition on any forecastle; that any forecastle deck was, in a rain or snow storm, bound to be slippery; and that no negligence or lack of seaworthiness had been shown.

We do not and cannot decide that the condition proved to exist at the time of appellant's fall did or did not proximately cause appellant's fall, or play any part at all in plaintiff's injury, nor that there was or was not negligence in the operation of the vessel or that an unseaworthy condition existed. These are questions of fact for the jury and cannot, in view of the evidence introduced in this case, be decided by the judge as a matter of law.

The most recent decisions of the Supreme Court in both Federal Employers' Liability Act cases and Jones Act cases, require us to accept a more liberal view than that formerly enunciated by the courts in these types of cases. Kernan v. American Dredging Co., 1958, 355 U.S. 426, 431, 78 S.Ct. 394, 2 L.Ed.2d 382; Rogers v. Missouri Pacific Railroad Co.,

among tankers and tanker men with respect to the care and maintenance of the forecastle head deck on their tankers? A. Yes, sir. I would say on the ships I have gone aboard and relieved the previous man, why, I would say normally, I mean you run across all kinds, some using it more extensively than others, and some might put it just around the cargo risers, and others around the forecastle head, and others might put it in the same places, including the weather deck, and others put it on the poop deck, where the crew stays aft, but I used to put it all over, including the life boat decks.

"Q. With respect to the forecastle head deck itself— A. I can't recall off-hand any ship I ever relieved that it wasn't on there." [Tr. p. 85.]

5. "Q. Would you tell the court and the jury in what way the forecastle head deck of those tankers you sailed aboard was kept and maintained.

\*　　\*　　\*　　\*　　\*

"A. Well, sir, the surface is prepared by chipping, scraping, wire brushing to bare metal—usually this is in spots where the previous paint has rusted out. Then several coats of red lead are applied, and then what you might call filler coats, to bring the paint up to the existing level of the old surface, and as the final coat you would use, rather, I would use either a nonskid type of paint or would throw sand over the area while the finish coat is still wet.

"Q. Did you keep and maintain the forecastle head deck in the manner you have just described aboard all the tankers aboard which you sailed prior to November 1955? A. Yes, sir, I did." [Tr. pp. 121–122.]

6. "Q. On board those tankers that you served as second mate or any other capacity other than chief mate, would you tell us what was the practice of other chief officers under whom you sailed up until November 1955 in keeping and maintaining the forecastle head deck area of tankers? A. I would say their practice more or less coincided with mine as chief officer. I probably was broken into that method by working under chief officers like that." [Tr. p. 123.]

7. Exhibits 3, 4, 5 and 6.

1957, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed. 2d 493; Webb v. Illinois Central Railroad Co., 1957, 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503; Ferguson v. Moore-McCormack Lines, 1957, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511; Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 525, 76 S.Ct. 608, 100 L.Ed. 668; Pacific Far East Lines, Inc., v. Williams, 9 Cir., 1956, 234 F.2d 378, 379, certiorari denied 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76; Cf. Hawley v. Alaska Steamship Co., 9 Cir., 1956, 236 F.2d 307; Williams v. Tide Water Associated Oil Co., 9 Cir., 1955, 227 F.2d 791, certiorari denied 350 U.S. 960, 76 S.Ct. 348, 100 L.Ed. 834.

Quoting from the Rogers case, supra:

"Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities." Id., 352 U.S. at page 506, 77 S.Ct. at page 448.

In Bailey v. Central Vermont Ry., Inc., 1943, 319 U.S. 350, 352–353, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444, the Court said:

"The nature of the task which Bailey undertook, the hazard which it entailed, the effort which it required, the kind of footing he had, the space in which he could stand, the absence of a guard rail, the height of the bridge above the ground, the fact that the car could have been opened or unloaded near the bridge on level ground—all these were facts and circumstances for the jury to weigh and appraise in determining whether respondent in furnishing Bailey with that particular place in which to perform the task was negligent. The debatable quality of that issue, the fact that

fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue (citing cases) as well as issues involving controverted evidence. (Citing cases.) To withdraw such a question from the jury is to usurp its functions."

The judgment of dismissal is reversed and the cause remanded for a new trial.