Ciarolla, Appellant, *v.* Union Railroad Company.

Argued November 11, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Paul E. Moses,* with him *Evans, Ivory & Evans,* for appellant.

*Gerald C. Paris,* with him *Robert L. Potter,* and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY CERCONE, J., April 22, 1975:

This appeal arises from the lower court's granting of the defendant-railroad's motion for a compulsory non-suit in an action for damages brought under the Federal Employer's Liability Act, 45 U.S.C. §§51-60 (1971)

(FELA). The plaintiff's claim for relief rested upon two wholly separate accidents which occurred while plaintiff was an employee of the railroad working in their "bridge and buildings department" as a repairman. The two incidents will be separately described below.

## The Peters Creek Bridge Accident

In July of 1969 Patsy Ciarolla, the plaintiff, and a crew of men were assigned to replace the steel in the Peters Creek Bridge over the Union Railroad line in Clairton, Pennsylvania. Large steel beams weighing approximately 1700 pounds were to be lifted into place by means of a device called a grip hoist. Two grip hoists would be used to lift each beam with one man operating a hoist at either end of the beam. The handle of the device, which moved through a vertical arc of thirty inches, would be pushed down and pulled up by the operator. Both the downward and upward motions would move the beam two or three inches, and the operators were required to fairly synchronize their efforts lest the beam tilt too radically toward the slower worker. When that happened, the slower worker would be forced to expend a greater effort. The work was admittedly hard, and the men requested that an air winch be used instead—not because they feared injury, however, but because the winch would make their task far easier.

Operating the grip hoist was the job that Mr. Ciarolla had been assigned to do when he injured his back. According to his testimony, in his nineteen years on the railroad he had never operated a grip hoist before the Peters Creek assignment, and on the day in question he was unable to lift his end as quickly as was his partner. While jacking the hoist he began to feel "bad" and suffered back pain. Although he did not then complain to the foreman, his back injury required his hospitalization the next day.

## The High Grade Bridge Accident

In May and June of 1971 Mr. Ciarolla was put to work replacing the wooden walkway with steel grating on the railroad's High Grade Bridge in East Pittsburgh. Part of the work involved laying steel girders upon which the grating for the walkway would eventually rest. The girders varied in length from ten feet to forty feet, weighed approximately fifty pounds per foot, and were brought to the bridge by the railroad via flatcar. Sometimes the girders were unloaded from the flatcar by crane and sometimes manually. Until the day of plaintiff's mishap, the girders had been unloaded on the side of the tracks where they were to be placed. On this particular day, however, for a reason unexplained in the record, the girders were unloaded on the wrong side of the tracks, and Mr. Ciarolla and two other employees were directed to carry the ten-foot girders across the tracks to the place where they were to be used. According to Mr. Ciarolla, this was the hardest work he had ever been required to do by the railroad, and he had unsuccessfully requested that a crane be assigned to do the job. The work required carrying the girders over both the northbound and southbound tracks across the bridge, while being sure to walk on the railroad ties, because there were openings between the ties with only the creek twenty-five feet below. Thus, the men had to be careful with their footing and were unable to coordinate their strides, so that the girders would frequently jerk backward and forward as the men crossed the rails and secured their footing on the ties. On one occasion, as Mr. Ciarolla stepped across a rail, he felt his back snap. Since that time, apparently, he has been unable to work for the railroad.

### Forseeable Risk of Harm

Were these the only facts of record in the instant case, the court's error in granting appellee's motion for

a compulsory non-suit would be obvious, for the law is clear that only in the most frivolous cases may the courts deny an FELA plaintiff his qualified right to a jury trial. As the United States Supreme Court stated in the landmark case of *Rogers v. Missouri Pacific Railroad Co.*:[1]

> "The Congress when adopting the law was particularly concerned that the issues whether there was employer fault and whether that fault played any part in the injury or death of the employee should be decided by the jury whenever fair-minded men could reach these conclusions on the evidence.
>
> . . . . . .
>
> "The decisions of this Court . . . teach that the Congress vested the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury." 352 U.S. at 508, 510.

In the instant case, a jury could reasonably determine that the work the railroad required of Mr. Ciarolla involved an unreasonable risk of harm. In the Peters Creek accident reasonable minds could differ on whether requiring Mr. Ciarolla to use a grip hoist, to lift 1700 pound beams for the first time was negligent.[2] Or, the jury might have determined that Mr. Ciarolla's fellow employee was negligent in raising his end faster than Ciarolla's, thereby shifting the weight of the girders to Ciarolla.

---

1. 352 U.S. 500 (1957).

2. The testimony indicated that grip hoists were also frequently used in much lighter work such as raising scaffolding; and, therefore, they were not specifically designed, or principally used for, lifting objects as heavy as the steel beams. In any event, the question is not what weight would strain the grip hoist to the breaking point but, rather, given the hoist's mechanical efficiency, what weight would forseeably strain the back of the operator to its breaking point.

The likelihood of the jury's finding the railroad negligent with regard to the High Grade Bridge accident is even greater. One could reasonably determine that carrying a five hundred pound beam over such treacherous footing, as the load shifted with every uncoordinated stride of the three men, involved an unreasonable risk of harm, especially since the railroad's unloading procedure had previously avoided such a necessity.[3]

## Causation

Thus, the remaining question is whether the potentially "negligent conduct" of the railroad caused the back injuries to Mr. Ciarolla.[4] In this regard additional facts become relevant. Since 1965, at least, Mr. Ciarolla suffered with a chronic back problem, an ailment which he had never mentioned to the railroad. Indeed, from 1965 to 1969 his back frequently bothered him so severely that he had to visit his chiropractor for relief.

Having discovered Mr. Ciarolla's history of back ailments only after these proceedings were instituted, the railroad successfully contended below that the work required of Mr. Ciarolla was not dangerous, and that his injury occurred only because of his weak back. Furthermore, the railroad argued, Mr. Ciarolla was negligent in not advising the railroad of his ailment and requesting lighter duties. Thus, Mr. Ciarolla's history of back trouble lent weight to the railroad's argument that their conduct was not negligent, and raised the possibility that Mr. Ciarolla's own negligence was the sole cause of his injury.

---

3. Cases wherein the railroad was found liable in requiring an employee to work in a strained position are collected in Annotation, 77 A.L.R. 2d 779 (1961). See also *Heater v. The Chesapeake and Ohio Railway Co.*, 497 F.2d 1243 (7th Cir. 1974).

4. Cases on "causation" under the FELA are collected in Annotation, 98 A.L.R. 2d 653 (1964).

While the contributory negligence of Mr. Ciarolla, if any, may be considered on the question of damages as a partial defense, it is improper to consider it in evaluating the propriety of the railroad's conduct. In *Buffo v. Baltimore & Ohio R.R. Co.*, 364 Pa. 437 (1950), our Supreme Court was asked to reverse a jury verdict for plaintiff and find that plaintiff's negligence was the proximate cause of his accident. In refusing to do so the Court pertinently stated:

> "Defendant's negligence cannot be determined by examining plaintiff's conduct. To do so would be to apply contributory negligence as a defense under the guise of 'non negligence' of the defendant, which the Act prohibits." 364 Pa. at 442.

Thus, Mr. Ciarolla's alleged negligence may only be considered on the question of causation, and even then great deference must be given to an FELA plaintiff's right to a jury trial. As the Supreme Court stated in the *Rogers* Case, supra, the test of a case for the jury under the FELA "is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." 352 U. S. at 506. (Emphasis added.)

Assuming *arguendo* that the railroad required Mr. Ciarolla to attempt work which involved an unreasonable risk of harm, query whether one could say, with reason, that the work caused the injury to Mr. Ciarolla's back. The railroad suggests that we infer that even if the heavy work the railroad demanded of Mr. Ciarolla had *not* involved an unreasonable risk of injury, *his* back would have been injured because, given his chronic back problem, he was unable to do any weightlifting safely. The suggestion, however, is misleading, at least in an FELA case.

In *Coray v. Southern Pacific Railroad Co.*, 335 U.S. 520 (1949), the United States Supreme Court con-

sidered, and rejected, a similar argument by the railroad. Therein, the decedent had been a railroad employee who had been assigned the task of breaking-in a new man. The decedent and the new man boarded what apparently was an independently-powered, railroad "motor car" and began to follow several hundred feet behind a train—the decedent pointing out various points and occurrences of interest to his understudy. While he intently explained a signal that they had just passed to the new man, he failed to notice that the train had stopped in front of him because of faulty air brakes. The distance separating the motor car and the train would have provided more than ample time for the decedent to safely stop the motor car, but his inattentiveness deprived him of that safety margin. The resulting collision caused his death. The Utah Supreme Court found that the stopped train was merely a condition upon which the decedent's supervening negligence had operated. Therefore, the Utah court concluded that it was not the train's stopping, but decedent's negligence, which caused his death. The Utah court held that the *reason* the train had stopped—that is, its defective brakes—was irrelevant to the question of causation. The United States Supreme Court reversed, however, finding that the question of causation was one properly for the jury. In so doing the Court criticized the Utah Supreme Court's sanctioning of overnice theoretical distinctions between various types of causation, stating:

> "The language selected by Congress to fix liability in cases of this kind is simple and direct. Consideration of its meaning by the introduction of dialectical subtleties can serve no useful interpretative purpose." 335 U.S. at 524.

Insofar as the question of causation is concerned, there is no relevant distinction between the *Coray* Case and the instant case. Certainly, a jury may conclude after a full trial that the alleged negligence of the rail-

road did not cause Mr. Ciarolla's back injury, but rather that he had suffered it because of his negligent disregard for his own safety. However, a jury could also determine, with reason, that Mr. Ciarolla's back would not have been injured had he not been overburdened. Or, finally, the jury could decide that the negligence of both parties contributed to the injury, and properly apportion the damages.[5] In any event we find that the solution was one for the jury, not the court. As the Supreme Court said in *Wilkerson v. McCarthy:*

> "Here there are many arguments that could have been presented to the jury in an effort to persuade it that the railroad's conduct was not negligent, and many counter arguments which might have persuaded the jury that the railroad was negligent." 336 U.S. 53, 63 (1949).

Under the case law, Mr. Ciarolla's entitlement to damages, albeit apportioned, appears to be far too close a question to be resolved other than by a jury. To deprive railroad "workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." *Bailey v. Central Vermont Railway, Inc.,* 319 U.S. 350, 354 (1943). See also *Blair v. Baltimore & Ohio Railroad Co.,* 323 U.S. 600 (1945). We are compelled to follow both the letter and spirit of these precedents.

Order and Judgment of the lower court is reversed, and the case is remanded for a new trial.

---

CONCURRING AND DISSENTING OPINION BY PRICE, J.:

I must dissent from the Majority's conclusion that a jury trial is necessary to resolve the issue of Union Railroad's liability for Mr. Ciarolla's injuries as to the Peters Creek Bridge accident. I have scrutinized the entire record and can find nothing which supports appellant's allegation that Union Railroad was negligent in the

---

5. 45 U.S.C. § 53.

methods it employed to construct that bridge. Therefore, even under the doctrine of *Rogers v. Missouri Pacific Railroad Company,* 352 U.S. 500 (1957), I cannot find sufficient evidence of negligence to place this case before a jury.

I am unable to agree with the Majority's statement of certain facts. With regard to the Peters Creek Bridge accident, the Majority states: "According to his testimony, in his nineteen years on the railroad he had never operated a grip hoist before the Peters Creek assignment, and on the day in question he was unable to lift as quickly as was his partner . . . ." However, on cross-examination, Mr. Ciarolla stated:

"By Mr. Paris:

Q. Mr. Ciarolla, this was not the first occasion that you operated a grip hoist. Is that correct?

A. In that manner, yes.

Q. What other occasions had you operated a grip hoist?

A. Oh, there was times when maybe we had to pull maybe two pipes or two of something together, something like that. I don't recall.

Q. But you had never used the grip hoist to raise a beam?

A. No, this was the first job I ever did with a grip hoist on a beam.

Q. Did you ever use the grip hoist after this occasion to raise beams?

A. I don't recall.

Q. Now, how long had you used the grip hoist on the Peters Creek Bridge?

A. As long as I was there, and I don't recall the date.

Q. Do you recall how many days?

A. No, I don't. . . ." (NT 54a-55a)

Mr. Ciarolla further testified:

"Q. Do you recall how many days before that that you worked and used the grip hoist?

A. No, I don't. *I did use it a few times,* but I don't recall when." (NT 63a) (Emphasis added)

Later on cross-examination, Mr. Ciarolla testified as follows:

"Q. Can you tell the ladies and gentlemen of the Jury on how many days you used that grip hoist that you can recall?

A. How many days I used it?

Q. Yes, on the Peters Creek Bridge.

A. I don't recall. It *could have been two or maybe three,* I don't know. Like I said, we had different jobs and went different places." (NT 90a) (Emphasis added)

I believe that this testimony is most significant in that it indicates that Mr. Ciarolla was experienced in operating grip hoists and, consequently, aware of the difficulties he would encounter. The testimony is not sufficient, however, to permit the inference that appellant was injured on the first day he operated the grip hoist for the Peters Creek Bridge construction.

In addition, the Majority states at note 2: "The testimony indicated that grip hoists were also frequently used in much lighter work such as raising scaffolding; and, therefore, they were not specifically designed, or principally used for, lifting objects as heavy as the steel beams."

I am not able to give such an interpretation to the testimony. On cross-examination, found at page 73a of the record, Mr. Ciarolla was questioned about the capacity of a grip hoist, and responded as follows:

"Q. Do you know what the capacity of a grip hoist is?

A. No, I don't.

Q. To the best of your knowledge, then, it may be more than that to raise the beams?

A. The capacity of the machine?

Q. Yes.

A. I would say—it's a three-eighths inch cable, a pretty heavy cable, so—

Q. It could have lifted a beam maybe two or three thousand pounds, couldn't it?

A. I would say so. It could have.

Q. And a beam that was three thousand pounds is certainly much heavier than the beams you were raising, isn't it?

A. I don't know. I don't even know what they weighed."

The record establishes that the longest beam moved by the grip hoist for the Peters Creek Bridge project weighed 1,700 pounds. The smallest beam weighed 820 pounds. All beams had to be raised approximately 28 feet.

Accepting the fact that a 1,700-pound beam had to be raised, and accepting appellant's own testimony as to the capacity of a grip hoist, I believe the record adequate to establish that a grip hoist was properly designed for the work involved, and adequate to perform the task. Moreover, testimony by the appellant, found at page 165 of the original record, establishes that *two* grip hoists were attached to the heavy beam even though *one* would have been sufficient to lift the weight. There is nothing on the record which indicates that the grip hoist was unsafe. In fact, appellant testified that the grip hoist was safe, but that some method of lifting the beams could have been used to make the work *easier,* but not *safer:*

"Q. And aside from the fact that the work you did was hard work, there was nothing else improper or unsafe about what was done, was there?

A. The grip hoist was unsafe, yes, sir.

BY THE COURT:

Q. In what way was it unsafe, Mr. Ciarolla?

A. The way you were standing.

Q. Not the way you were standing. You said the grip hoist was unsafe. Tell us how.

A. No, this grip hoist itself was not unsafe, I wouldn't say that. You're referring to the grip hoist itself, am I correct?

BY MR. PARIS:

Q. Yes. There was nothing wrong with the grip hoist?

A. No.

Q. It worked properly?

A. Yes, it did.

Q. It did the job?

A. I guess, yes.

Q. Well, the beams went up, didn't they?

A. Yes, right." (NT 126a-127a)

I believe, as a matter of law that the record is devoid of any evidence of the railroad's negligence in its use of a grip hoist at the Peters Creek Bridge. Therefore, I do not believe appellant is entitled to a jury trial.

I must concur with the Majority, however, regarding the High Grade Bridge accident. While there is ample evidence of record that appellant was contributorily negligent in failing to inform the railroad of his history of back injuries, I agree with the Majority that in an FELA case, the test of a jury trial "is simply whether the proofs justify with reason the conclusion that the employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers, supra,* at 506; *Heater v. The Chesapeake and Ohio Railway Company,* 497 F.2d 1243, 1246 (7th Cir. 1974). I believe there is a factual issue of negligence by Union Railroad as to the High Grade Bridge accident, which should be decided by a jury.

I would therefore affirm the entry of the compulsory non-suit as to the Peters Creek Bridge cause of action, and reverse such entry and remand for trial as to the High Grade Bridge cause of action.

VAN DER VOORT, J., joins in this concurring and dissenting opinion.