**AUGUST   v.   TEXAS & N. O. R. CO.**

No. 4939.

Court of Civil Appeals of Texas.

Beaumont.

Feb. 4, 1954.

Rehearing Denied Feb. 24, 1954.

Faver & Barnes, Jasper, for appellant.

Cecil, Keith & Mehaffey, Beaumont, for appellee.

**ANDERSON, Justice.**

This suit was brought by appellant, Henry August, to recover damages for personal injuries which he claims to have sustained on February 3, 1950, while in the course of his employment with appellee, Texas and New Orleans Railroad Company. It was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Trial resulted in an instructed verdict and a judgment in favor of the defendant railroad company. The only question for review is whether on the evidence adduced the trial court erred in instructing a verdict for the defendant.

Appellant claims to have injured his back while manually lifting a coupler on one of appellee's empty tank cars. He was lifting the coupler so that a jack could be inserted under it for the purpose of raising one end of the body of the car. He alleges that appellee was negligent in that it "failed to provide proper equipment for the use of plaintiff in lifting the end of the car at the time and place in question"; in that "the equipment supplied by defendant for the use of plaintiff at the time and place in question was inadequate"; in that "defendant failed to provide a place and surroundings that was reasonably safe for the plaintiff to work at the time and place in question"; in that "the defendant failed to provide a second jack to raise the end of the car high enough for the available jack to be placed under the end of the car"; in that "defendant, through its duly authorized agents and servants, required plaintiff to work under the circumstances then prevailing without adequate number of employees to assist plaintiff"; and in that "the defendant, through its agents and servants, required plaintiff to undertake to lift a load that was too heavy for the strength of the plaintiff."

The following summary sufficiently presents the evidence in the light most favorable to appellant:

Appellant was employed in appellee's repair shop as a "repacker," and had been so employed for more than four months before the date of his alleged injury.

Among his duties were those of removing old or used cotton waste from the journal boxes of railroad cars and repacking the journal boxes with new waste, and of inspecting the journal bearings and replacing them when necessary.

Journal bearings are concave on one side so as to form a half cylinder. They fit over those portions of the car axles which are on the outward sides of the wheels. These portions of the axles (commonly referred to as journals), together with their bearings and oiling devices, are each separately housed in a metal box which is known as a journal box. The journal bearings, it appears, support the weight, or at least some substantial portion of it, of both the body of the car and the superstructures of the trucks on which the body of the car rests.

The body of a railroad car, which is a unit within itself, is supported at each end by a unit that is termed a truck, and is held in place by a vertical shaft. Either of its ends can be raised and the truck withdrawn from under it. The trucks are each comprised of two axles, four wheels, and their superstructure. The superstructure of a truck unit weighs several hundred pounds, and a jack must be made use of in raising it, even after the body of the car has been raised.

In order to inspect the journal bearings of a car it is necessary that the pressure which is normally imposed on them by the weight of the body of the car and of the superstructure of the car truck be first relieved. This is accomplished by the use of jacks, and because of the way in which the cars are constructed it can be accomplished in either of two ways: (1) The pressure can be relieved on one bearing at a time by jacking up the journal box in which such bearing is housed. This is done with a small jack which is designed for the purpose, known as a journal jack. (2) The pressure can be relieved on four bearings at a time by first jacking up one end of the body of the car with one or more large jacks, and by then jacking up the superstructure of the car truck with a smaller jack known as a track jack.

The latter method appears to have been the one ordinarily made use of by the appellant. He said that he could not by the use of journal jacks perform his duties with the dispatch required, because with them eight separate jacking operations are required. He was expected, or so he testified, to complete his work on a car within the course of two hours.

When raising the end of a loaded car, the appellant used two 50-ton-capacity jacks, one under each side of the car. When raising the end of an empty car, however, it appears to have been his practice to use only a single 35-ton-capacity jack, inserted under one of the car's couplers. The couplers (the devices by which one car is connected to another) are centrally located in the ends of the body of the car, and are capable of limited motion in a vertical plane. For varying reasons it is necessary at times to raise a coupler slightly, before a 35-ton-capacity jack can be inserted under it; and it was while he was thus engaged that appellant alleges he was injured.

The appellant testified that ordinarily he used a track jack to raise a coupler when it was necessary to do so in order to get the larger 35-ton-capacity jack under the coupler, but that on the particular occasion all of the track jacks were being used by other employees. A number of cars which required wheel changes appear to have been placed on the repair track that morning, and the track jacks which were in usable condition were being used by the car repairmen in changing the wheels.

It appears that normally the appellee kept some 14 to 18 jacks of various sizes available for use in carrying on its work (journal jacks, track jacks, 35-ton-capacity jacks, and 50-ton-capacity jacks), among them eight track jacks. Presumably, however, there were only seven track jacks in usable condition on the day appellant claims to have been injured, for one had been prepared for shipment to Houston to be repaired. The jacks were kept in a tool house, and appellee's employees were at liberty to use such of them as they needed in their work. It also appears likely from the evidence that one or more journal jacks had been assigned to appellant for his own separate use.

The appellant testified that before undertaking to lift the coupler manually, he looked in the tool house and about the yard for a track jack, but found none in usable condition that was not in use. He did not, however, report this temporary shortage of track jacks to appellee's foreman or to any other of appellee's responsible agents or representatives, nor did he request of the foreman or any other of appellee's responsible agents or representatives that additional workmen be assigned to help him. Neither did he request any of his fellow employees, of whom there were some twelve working nearby, to assist him in lifting the coupler. He only requested a fellow employee who happened to be passing by to insert the jack under the coupler when he himself should raise the coupler. He said that his was considered to be a one-man's job, and that he would have expected to be so informed by his fellow employees if he had asked any of them to help him lift the coupler.

It is to be inferred from the evidence that the 35 and 50-ton-capacity jacks can always be inserted under the sides of a car without the aid of any other type of jack; and it affirmatively appears that when journal jacks are used there is no occasion to jack up the body of the car separately. The evidence does not disclose that there was any shortage of jacks of either of these types upon the occasion of appellant's alleged injury. The appellant's explanation of his failure to use two 35-ton-capacity jacks, one on each side of the car, was that this method of raising an empty car had never been demonstrated to him.

The appellant estimated the weight of a coupler to be in excess of 200 pounds, and described the lifting of one of them as "a heavy lift" for one man. He testified, however, that prior to the date of his alleged injury he had lifted other couplers by hand, and had experienced no difficulty

in doing so. He had also seen other of appellee's employees lift couplers by hand on several occasions.

No one either ordered, directed or requested appellant to raise the coupler by hand on the occasion of his alleged injury. Neither appellee's foreman nor any other with supervisory control over appellant appears to have been present at the time. It does not appear, in fact, that appellant had ever been specifically instructed or directed to lift a coupler by hand. He did testify, however, that that means of raising a coupler when no track jack was available had been demonstrated to him by John Joseph, a fellow employee who in the beginning had been assigned the task of instructing him regarding the duties of a "repacker" and their manner of performance. He also testified that at the time he was placed under Joseph's tutelage, he was directed by appellee's foreman to follow Joseph's instructions.

The appellant was only 35 years of age at the time he alleges he was injured, and he both plead and introduced evidence tending to show that before his alleged injury he was physically strong and accustomed to doing hard manual labor. No contention is made that the coupler which he lifted at the time he claims to have been injured was heavier than ordinary couplers or that because of any mechanical defect it was harder than ordinary to lift.

The basis of an employer's liability under the Federal Employers' Liability Act is his negligence, not the mere fact that an injury has occurred. And that negligence must be in whole or in part the cause of the injury. Whether those standards are satisfied is a federal question. Ellis v. Union Pacific R. Co., 329 U.S. 649, 67 S.Ct. 598, 91 L.Ed. 572; Bailey v. Central Vermont R. Co., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444. Federal decisional law formulating and applying the concept of negligence governs. Thus, federal law, and not state law, governs the measure of the carrier's responsibility respecting the character and safe condition of the place of work, as well as his responsibility for the appliances for doing

the work. Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282. Whether sufficient evidence of negligence is furnished to justify submission of a case to the jury is likewise a question to be determined by federal law. Brady v. Southern R. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Western & A. R. Co. v. Hughes, 278 U.S. 496, 49 S.Ct. 231, 73 L.Ed. 473.

The federal rules of law by which the rights accorded the parties by the Federal Employers' Liability Act are interpreted and appraised "have been largely fashioned from the common law * * * except as Congress has written into the Act different standards." Bailey v. Central Vermont R. Co., supra [319 U.S. 350, 63 S.Ct. 1064]. The common law concept of negligence, subject to such qualifications as Congress has imported into the term, is to be applied. Urie v. Thompson, supra. More specifically, it is said in Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 451, 87 L.Ed. 610: "In this situation the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done. * * * Of course in any case the standard of care must be commensurate to the dangers of the business." The common law principle that the master is under the primary and nondelegable duty to use reasonable care in providing a sufficient number of persons to perform the services required or to do the particular piece of work in hand, or in providing proper tools and appliances and reasonably safe means and methods of work, appears to be also fully accepted as a part of our federal jurisprudence. Patton v. Texas & P. R. Co., 179 U.S. 658, 21 S.Ct. 275, 278, 45 L.Ed. 361; Bailey v. Central Vermont R. Co., supra. In the Patton case it is said: "He [the employer] is bound to take reasonable care and make reasonable effort; and the greater the risk which attends the work to be done and the machin-

ery to be used, the more imperative is the obligation resting upon him. Reasonable care becomes, then, a demand of higher supremacy; and yet, in all cases it is a question of the reasonableness of the care; reasonableness depending upon the danger attending the place or the machinery."

The federal rule or standard by which the propriety of an instructed verdict is to be determined appears to be that it is proper for the presiding judge, and his duty, to direct a verdict when the evidence and all inferences which a jury could justifiably draw therefrom would be insufficient to support a verdict for the other party. Western & A. R. Co. v. Hughes, supra; Patton v. Texas & P. R. Co., supra. In line, however, with the general policy of liberally construing the Federal Employers' Liability Act, it appears to be the federal policy to construe the facts of a given case as favorably to the employee as they will permit, and to require submission of doubtful cases to a jury. It was said, for example, in Bailey v. Central Vermont R. Co., supra: "To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them."

A comparison of federal and Texas authorities will disclose that both the federal concept of negligence and of the basic common law principles and the federal standard by which it is determined when a verdict should be instructed are essentially the same as those applied by our Texas courts. Therefore, in the absence of a federal decision on a parallel fact situation at variance with them, we think it both proper and necessary that we have recourse to our Texas decisions for guidance in disposing of the case at bar. And, in our opinion, the applicable rules of law are set out in the case of Western Union Telegraph Co. v. Coker, 146 Tex. 190, 204 S.W.2d 977, 978, from which we quote:

"The law imposes upon the employer the duty to exercise reasonable care in providing for an employee adequate help in the performance of work required of him. The duty is nondelegable and continuous, the rule being in principle the same as that requiring the employer to furnish his employee with safe instrumentalities and a safe place to work. * * * Labatt's Master and Servant, 2d Ed. Vol. 3, pp. 2912–2915, Sec. 1107.

"The text last cited, in addition to the statement of the general rule, contains on page 2914 the following: 'So far as the movements of servants may depend upon their own volition, and are not in any way affected by the control of a superior, it is clear that there can be no recovery on the theory that the number of servants was temporarily inadequate at the time and place where the injury was received, unless it is shown that such inadequacy was known, actually or constructively, to the master or his representative.' See also 35 Am.Jur., p. 626, Sec. 197.

"The employer is not liable when he has provided help and injury results from the act of the employee in voluntarily proceeding to do the work without assistance. The same is true when sufficient help is nearby and available and the employee does the work alone without seeking or asking for assistance. Hines v. Ross, Tex. Civ.App., 230 S.W. 1066; Melton v. Texas & N. O. R. Co., Tex.Civ.App., 254 S.W. 510; Jarvis v. Erwin Cotton Mills Co., 194 N.C. 687, 140 S.E. 602; 39 C.J., p. 525, Sec. 630."

When the foregoing principles are applied to the facts of the case at bar we are of the opinion that negligence on the part of appellee was not shown. The appellant makes no contention that either additional workmen or additional tools or appliances were needed for the safe performance of his tasks under normal conditions. There was no showing that the number of track jacks which appellee had on hand and available to its employees was not sufficient for the purpose of carrying on its normal work. The fact that at the time appellant claims to have been injured the number available was temporarily inadequate was not shown to have been known, either actually or constructively,

to the master or its representatives. Furthermore, there was no showing that there was not available to appellant a sufficient number of appropriate jacks with which to do safely the work which it was his duty to perform. He could have jacked up the body of the car by placing one of the 35 or 50-ton-capacity jacks under each side of it, and he could have jacked up the journal boxes with journal jacks. The mere fact that the particular type jack that he desired at the moment and customarily used was not available is not a sufficient basis on which to predicate a finding of negligence on the part of the master for failing to supply adequate tools and appliances with which to carry on his work. No one ordered appellant to lift the coupler by hand. He acted of his own volition, without having apprised any of the master's representatives that he was going to lift the coupler, without having requested that additional employees be assigned to assist him, and without having requested any of his fellow employees to assist him. The appellant was experienced in his job, intelligent, and had previously lifted couplers and knew their weight. It does not appear that his work could have been much expedited by lifting the coupler. After raising the end of the body of the car it was necessary before proceeding that he either wait for a track jack to be released by one of his fellow employees or else resort to the use of a journal jack. We do not feel that it can justifiably be said that in such circumstances the master should have foreseen that the employee would for more or less futile purposes undertake to lift the coupler by hand.

The appellant advances the theory that foreseeableness is no longer a primary element of actionable negligence in cases arising under the Federal Employers' Liability Act, but with this we cannot agree. The federal courts have criticized the rules by which Congress has seen fit to fix liability in industrial cases of this kind, but recognize that only Congress can change them, and that the courts must continue to apply them according to their established concepts.

In support generally of his contention that the evidence was sufficient to raise a jury issue as to actionable negligence, the appellant cites and relies on the case of Kansas City Southern Ry. Co. v. Chandler, Tex.Civ.App., 192 S.W.2d 304, decided by this court. Aside from the fact, however, that it accentuates the care with which we must avoid confusing the doctrine of assumed risk with non-negligence, it gives no aid in this case. Our conclusion that no jury issue of actionable negligence was raised by the evidence finds support, we think, in the following cases, among others, Great Atlantic & Pacific Tea Co. v. Evans, 142 Tex. 1, 175 S.W.2d 249; Melton v. Texas & N. O. R. Co., Tex.Civ.App., 254 S.W. 510; Doty v. Fort Worth & D. C. Ry. Co., 127 Tex. 521, 95 S.W.2d 104; Hines v. Ross, Tex.Civ.App., 230 S.W. 1066; Shumake v. Great Atlantic & Pacific Tea Co., Tex.Civ.App., 255 S.W.2d 949; Armstrong v. Missouri-K-T-R. Co. of Texas, Tex.Civ.App., 233 S.W. 2d 942.

Being of the opinion that the trial court correctly instructed a verdict for the defendant, the judgment of the trial court is affirmed.