**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**Frank G. MENDOZA, Appellee.**

**No. 3739.**

Court of Civil Appeals of Texas.
Waco.

July 7, 1960.

Rehearing Denied July 29, 1960.

· Arterbury, Hoover & Graham, Houston, for appellant.

James H. Campbell, Hill, Brown, Kronzer & Abraham, Robert L. Steely, Houston, for appellee.

TIREY, Justice.

This is a negligence case. Plaintiff grounded the action under the provisions of Section 51 et seq., of 45 U.S.C.A., (Federal Employers' Liability Act) and the amendments thereto. Defendant entered a general denial and by trial amendment specially plead that plaintiff was negligent and that such negligence was a proximate cause of his injuries, in that plaintiff failed to get in a proper position before attempting to raise the brake shoe and lift it off of the rail, and that such negligence was the sole proximate cause of his injuries. In the alternative, defendant alleged that plaintiff's negligence constituted 90% of the total negligence involved, and further plead that the occurrence was the result of an unavoidable accident. Defendant's Motion for directed verdict was overruled. The jury found substantially: (1 and 2) That Terry, the fellow workman and the man in the pit, failed to use the iron bar to prevent the brake shoe from falling onto the rail as would have been done by a reasonably prudent person exercising ordinary care, and that such failure was the proximate cause for the occurrence of July 13, 1957; (3 and 4) That Terry ordered the brake shoe released when the iron bar was not in place, but that such act on the part of Terry was not negligence; (6 and 7) That the Railroad Company failed to furnish such equipment to prevent the brake shoe from falling onto the rail as would be furnished by a reasonably prudent employer, and that such failure was the proximate cause of the occurrence; (8 and 9) That the Railroad Company failed to furnish to Mendoza such a safe place in which to work as would have been furnished by a reasonably prudent employer exercising ordinary care, and that such failure was the proximate cause of the occurrence; (10) That Mendoza did not fail to

get into such a position before attempting to lift the brake shoe in question off the rail as would have been done by a reasonably prudent person exercising ordinary care; (14) That the occurrence was not the result of an unavoidable accident; (15) The jury awarded plaintiff the sum of $35,000 to compensate him for his injuries. The Court overruled Defendant's Motion for Judgment Non Obstante Veredicto, and granted Plaintiff's Motion and entered judgment for plaintiff in the sum of $34,698.87, and awarded to the United States Retirement Board the sum of $301.13, with interest, and taxed costs against defendant.

The judgment is assailed on eight points; they are substantially to the effect that the Court erred:

(1 and 3) In overruling Defendant's Motion for Instructed Verdict, and its Motion for Judgment Non Obstante Veredicto, and in entering judgment for appellee, because there is no competent evidence in the record which supports a finding of negligence against the defendant, and because there is no competent evidence tendered to support a finding that any negligent act or omission on the part of defendant was a proximate cause of appellee's injuries.

(2 and 4) In submitting issues 1, 6 and 8, and 2, 7 and 9, because there is no competent evidence to support an affirmative answer to any of said issues.

(5 and 6) In refusing to set aside the answers of the jury to Issues 1, 6 and 8, and to Issues 2, 7 and 9, because the answers of the jury to each issue are so against the great weight and preponderance of the evidence as to be manifestly wrong.

(7) In overruling Defendant's objection "C" to Special Issue No. 15.

(8) Because the amount of damages awarded by the jury in answer to Issue No. 15 in the sum of $35,000 is grossly excessive at least in the sum of $20,000, and the verdict should be set aside for the reason that an award so grossly excessive clearly evidences the deep seated prejudice on the

part of the jury against appellant and is clearly against the overwhelming preponderance of the evidence as to the extent of plaintiff's injuries. In the alternative, the Court should require that a remittitur in the sum of $20,000 be filed and in the event a remittitur is not filed, the judgment should be set aside, and a new trial ordered.

■ Defendant, in its brief, says substantially that the first four points present the contention that there is no evidence to support the findings of negligence and proximate cause made by the jury, and they brief them together. In appellant's brief we find substantially the following statement:

The facts relative to the liability issue are not in substantial dispute. Briefly, the Plaintiff received whatever injury he has while he was working in Settegast Yards on July 13, 1957. He and two other employees were engaged in renewing five brake shoes on a locomotive which was then in the shops. They had renewed four of the brake shoes and were in process of renewing the fifth, when the incident in question occurred. The old shoe had been taken off and the three were in the process of placing a new shoe on. One of the employees, Davis, was standing approximately four feet from the locomotive wheel, where the plaintiff was located, holding the brake rigging back so as to give the plaintiff some slack between the rigging and the wheel so that the brake shoe could be fitted. The other employee, Terry, was in the pit, underneath the locomotive. The plaintiff placed the brake shoe on top of the locomotive wheel and slid it around the wheel, but the shoe, instead of stopping at the place were it should have stopped, slid down to the rail. No injury occurred, nor was anyone hurt by the shoe sliding down to the rail. However, since it was on the rail it was necessary that it be raised back up to the proper position which, according to the plaintiff, was about 12 or 18 inches from the rail. The plaintiff therefore reached down, on his knees, and, with the help of Terry, lifted the shoe back up to its proper loca-

tion. It was after this job had been completed and the plaintiff had stood up that he stated that he felt a burning sensation in his stomach and groin. There was no other incident and the plaintiff did not, according to his admission, slip or fall while lifting the brake shoe. Appellants then quote from Mendoza's testimony:

"On the night in question I had been working with Mr. Terry and Mr. Davis most of the night. We had put the entire eight hours in working together. When we first started on this brake job we picked the brake shoes up at the end of the shop. The laborers bring them to that point. There were five brake shoes to put on this engine on this night and we were putting the last one on when the incident occurred. When putting the other brake shoes on we just kinda divided up. Sometimes I lifted it and sometimes one of the other men lifted it and which ever one came first, well he lifted it up and put it on the wheel. That's the way it goes, we are all working together. I had put some of the other brake shoes up on the wheel that night. Mr. Terry had put some of the others up and Mr. Davis had put some of the others up. On this particular occasion, the one in question, I think that I put the brake shoe up on the wheel. Mr. Davis was pushing the slack out of the brake rigging so that we would have enough room to work and Mr. Terry was in the pit. I put the shoe up by myself and was holding it as it came over the side. Before I turned the shoe loose I asked Mr. Terry if he was ready and he said, 'Yes, I am ready', and I replied, 'Well here I go with the shoe', and I just let it go down. You just have to get your hands off of it, because you can't hold it anymore, let it go. I do not know whether there was a bar there to catch it (the brake shoe) or not. I just asked him if he was ready to hold it and he said yes turn it loose. That's what I did and it went on down to the rail. I didn't say anything to him about it going on down to the rail.

"Q. Was that the first one that had gone by to the rail that evening? A. I think so.

"Q. The way you say it makes me think you're not too sure on that point. A. Well, I can't remember it because, like I tell you, we were rushing and we put five shoes on that evening. And so I don't remember whether another one before that fall down on the rail. But in case they do, why, we just have to lift it and put it back, that's all.

"Q. It wasn't too unusual for them to go on down to the rail, was it? A. No. That happened lots of times.

"Q. And once they got down on the rail, you followed the usual procedure in getting it back up in place, did you not? A. You just have to pick it up and push it up and put 'em in place that's all.

"Q. You had lifted several before this one, had you not? A. Oh, yes. Yes sir. We do that every day.

"Q. And you did it the same way on this occasion as you have done previously, did you not? A. Yes.

"Q. Had you ever made any complaints or said anything to the foreman about having some bar or some stand or something there to catch it in case it went by? A. No sir. Nobody did. We just did it the best way we can.

"Q. Well, that's the way you have always done it? A. Always done it, yes sir.

"Q. And neither Mr. Humbert nor any of the foremen were there telling you how to do it, were they? A. He just tell you to do this, and that's all; you better know how to do it.

"Q. Well, you are a man of long experience— A. Yes sir.

"Q. —in that type of work, so he could be assured that you were familiar·

with the correct way to do this work? A. That's right.

"Q. That was your job, after you had been there for so long as you have been there, to know how to do those things, isn't it? A. Yes, sir.

"Q. Mr. Humbert or no other foreman was standing over you while you were doing the work saying, 'rush, rush,' was he? A. No sir. They got their job too. They got to keep on going.

"Q. And they do not give you a specific time limit to do any particular job, do they? A. Not exactly, no sir. Whenever they're in a rush, why, they tell you they want the thing as quick as you can, and that's all. The man do the best he can.

"Q. And, of course, they leave it up to you, knowing that you are experienced to do the work as best you can? A. That's right.

"Q. Without taking any more time than is necessary to properly do the job? A. Yes sir.

"Q. You feel, of course, and the men working with you, that Mr. Humbert did not want you to rush so as to not properly do the job? A. No sir. They don't want me to rush it, but he knows we do the job and that's all.

"It is not at all unusual for a brake shoe to slide on down to the rail. It happens sometimes.

"Q. On these other occasions when the shoe had slipped on down to the rail, had you gotten down and lifted it up just as you did on the occasion in question? A. Yes sir.

"Q. The very same way? A. Same way.

"Q. You did not slip or fall, or anything of that sort, while you were lifting it, did you? A. No sir.

"The rail (where the brake shoe came to rest) was approximately 30 or 36 inches above the concrete floor. It was necessary to pick the brake shoe up from that position and push it up about ten or twelve inches. Mr. Terry was attempting to help me do this, but he can't do too much since he is on the inside. This particular shoe was not any heavier than others which I had helped put on. All the engines of this type have this type brake shoe. The weight of this shoe was about the same as others that I had handled. I did not notice any unusual pain as I was lifting or pushing the brake shoe up until I got through putting it in place. When I attempted to stand up after putting the shoe in place I first felt the pain in my back and the burning in there (groin). I was senior man of the three of us who were working there on that particular job.

"Q. Well, I understand that you are testifying to that, but my question is you have used the key yourself, though, have you not? A. Oh, yes. Yes.

"Q. And you are not going to say that Mr. Terry was wrong in deciding to use the key instead of the bar on this particular occasion, are you? A. No sir.

"Q. Well, Mr. Mendoza, could it have been because the shoe came down with considerable momentum than he expected it to come down with? A. Well, I don't think it was coming no faster than the others because it's just a certain space in there. You guide that shoe over the wheel at the certain place and then you just have to turn it loose; so they all come the same.

"Q. You were the man that had hold of the shoe? A. At that time, yes sir.

"Q. And you had control over the momentum with which it came down? A. I can't understand you.

"Q. You had control over how fast the shoe came down? A. Well, I

just control the shoe until I can reach it, and I had to turn it loose; that's all.

"Q. I understand that, but neither Mr. Terry nor Mr. Davis had any control whatsoever over the shoe? A. No. I was the only one who handled that shoe then because Terry was in the pit and Davis was on the other end of the truck."

Appellants cite and quote extensively and discuss the following decisions from the Supreme Court of the United States: Tiller v. Atlantic Coast Line R. Co., 1943, 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610; Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Rogers v. Missouri Pacific R. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Webb v. Illinois Central R. R. Co., 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503; Herdman v. Penn. R. R. Co., 352 U.S. 518, 77 S.Ct. 455, 1 L.Ed.2d 508; Chesapeake & Ohio Ry. Co. v. Stapleton, 279 U.S. 587, 589, 49 S.Ct. 442, 443, 73 L.Ed. 861; Atlantic Coast Line R. R. Co. v. Collins, 4 Cir., 1956, 235 F.2d 805; Inman v. Baltimore & Ohio Railroad Co., 361 U.S. 138, 80 S.Ct. 242, 4 L.Ed.2d 198.

The appellant, after a discussion and quotations from the foregoing decisions of the United States Supreme Court, and some from United States Court of Appeals, in which petitions for writs of certiorari have been denied, says in effect that a declaration of our Texas Supreme Court in the case of Port Terminal Railroad Association v. Ross (a Federal Employers' Liability Act case), 155 Tex. 447, 289 S.W.2d 220, is controlling here, because in that case the Court clearly and positively laid down the principles which are to guide and control our Texas Courts of Civil Appeals and our trial courts in cases of this nature. We are in accord with this view. As we understand the appellant its position here is that there is an absence of evidence either circumstantial or direct tending to show that the negligence of the defendant as found by the jury had any influence or effect in causing the plaintiff's injury, and that by reason thereof the Court should have granted judgment for it on its motion notwithstanding the verdict. Stated another way, it is appellant's position that the failure of Terry to use the bar, plus the fact that the shoe falling did not inflict any injury on plaintiff, that there is no causal connection between the failure of Terry to use the bar and the act of plaintiff in getting in a position to lift the brake shoe. As we understand the opinions of the United States Supreme Court, we do not think that we are authorized to make such deductions.

■ In Rogers v. Missouri Pacific R. R. Co., supra, (cited by appellant) we find this statement [352 U.S. 500, 77 S.Ct. 448]:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or in part' to its negligence."

This doctrine was re-announced in Inman v. Baltimore & Ohio Railroad Company, supra. It is without dispute that in this operation it was the duty of one member of

this three-man crew to be in the pit under the locomotive and in this instance it was the worker, Terry. His job is and was to position the steel bar so as to stop the steel brake shoe after it had moved around the circumference of the wheel to its operating position. At the time of the occurrence, Mendoza was attempting to place the brake shoe in position, and in order to do so, he had to lift the brake shoe and place it on the top of the step ladder in order to start the shoe on its downward course around the wheel. The third man on the crew, who was Davis, was standing some four to eight feet from Mendoza, and it was his duty to exert pressure against the brake rigging of the engine, so as to permit the shoe to seat when it came down into position. As above stated, the bar was to be used by the man in the pit to prevent the shoe from falling past its designated position. On this occasion Terry used only a small brake shoe key for that purpose, although a bar was available and was laying on the floor of the pit with Terry. Terry used the brake shoe key in spite of the fact that the bar was safer and despite the fact that the falling shoe can knock the key aside and permit the shoe to fall onto the rail. Davis testified to the effect that when a bar is not used in the operation there is a good chance that the brake shoe will fall, and that the only way to prevent it from falling is to use the bar. As we understand the testimony of Terry, Davis and Mendoza, once the shoe was on the rails, the man required to pick it up was in an awkward, strained position. In the face of this evidence the railroad contends that there is no evidence to support the jury's finding of negligence in failing to use the bar. After the brake shoe fell it rested on the rail and was wedged between the wheel and the brake shoe head. The railroad did not furnish any mechanical process or machinery to its employees to lift the brake shoe from the rail and it had to be done by manpower alone, and because of its position with respect to other parts of the engine only one man could locate himself or position himself to do the lifting. In order

to do so, the man doing the lifting must squat or kneel into an awkward position to lift the brake shoe, and in this position Mendoza could not lift with the use of his legs, but must lift with his back only. In this squatting or kneeling position Mendoza was in a strain. Evidence was also tendered to the effect that Mendoza had only a small edge of the brake shoe to catch in order to lift it, and in addition to the foregoing the shoe weighed from 50 to 70 pounds, and Mendoza had the additional difficulty on this occasion of the shoe being jammed or wedged between the wheel or brake shoe head. Testimony was also tendered from a defendant's employee, who was offered as an adverse witness, that blocks or plates would have prevented the brake shoe from falling past its designated spot and the consequent requirement of an employee to get into an awkward or strained position to recover it, and there is an absence of evidence that defendant did furnish such blocks or plates to its employees. Evidence was also tendered to the effect that because Mendoza was the employee by the wheel in this particular instance, that it was his job to get into position to lift the brake shoe from the place it had fallen; that in so doing after he straightened up he felt a sharp pain in his back, and a burning in his groin. These are the first symptoms of the injuries made the basis of this suit. Because of the liberal interpretation in the application of the Federal Employers' Liability Act by the Supreme Court of the United States, we think we must overrule appellant's points 1 to 4 inclusive. See Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Bailey v. Central Vermont Ry., Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 417, 93 L.Ed. 497; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610; Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520.

Appellant's Fifth Point is to the effect that the answers of the jury to Issues 1, 6 and 8 are so against the great weight and

preponderance of the evidence as to be manifestly wrong. The Sixth Point makes the same complaint of the answers of the jury to Issues 2, 7 and 9. We think it our duty to overrule each of the foregoing points under the doctrine announced by the Texas Supreme Court in Port Terminal Railroad Association v. Ross, supra, and because of the opinion of the United States Supreme Court in Deen v. Hickman, 358 U.S. 57, 79 S.Ct. 1, 3 L.Ed.2d 28. (For history and facts of the Deen case see Gulf, Colorado & Sante Fe Railway Co. v. Deen, Tex.Civ.App., 275 S.W.2d 529, n. r. e.; 353 U.S. 925, 77 S.Ct. 715, 1 L.Ed.2d 721; Tex. Civ.App., 306 S.W.2d 171, w. granted 158 Tex. 466, 312 S.W.2d 933; 317 S.W.2d 913, Texas Supreme Court). We have given much consideration to the foregoing cases and we think that the factual situation here is quite similar in many respects to the factual situation that existed in the Ross and Deen cases.

The evidence here shows that the brake shoe weighed between 50 and 70 pounds, and that it was impossible, because of its position, for more than one man to lift it, because the brake shoe had no handhold but only a small edge for the workman to grip, and in order to grip it the workman was required to get in an awkward position, which put him in a strained position, particularly as to his back. In the light of this evidence we cannot say that as a matter of law that a reasonably prudent person would not have foreseen the possibility of injury resulting from a workman attempting to lift such an object under those circumstances. At the same time the evidence shows that it was possible to keep the shoe from falling by a simple use of an iron bar, and that the use of this iron bar was the safest way to do the work, and such bar was actually present and available and no excuse was offered in evidence as to why it was not used. The evidence also shows that the risks incident to workmen having to lift the shoe from this awkward, strained position could have been eliminated if the bar had been used.

It is true that the carrier is not the insurer of its employees, and is not liable for risks which cannot be eliminated through the exercise of ordinary care; however, it is not afforded the common law defense of the fellow servant doctrine under the F.E.L.A., 45 U.S.C.A., § 51. Moreover, if a method of work followed by the carrier's employees entails foreseeable risks to other employees which would be eliminated if another readily available and previously used method were adopted, the question of whether the employees were negligent in failing to adopt the latter method is one of fact for the jury. It is our view that the jury was justified in concluding that it could reasonably be anticipated that a workman might be injured if required to assume an awkward, strained position where a heavy object had to be lifted under circumstances where the object is difficult to grasp, and the lifting done by the use of the back alone without benefit of the legs. Here the plaintiff was injured without negligence on his part, and the evidence shows only one man could grip the object and no mechanical devices were furnished to assist the employee; that the plaintiff was injured while performing the very operation which the jury apparently decided was unreasonably hazardous, and which the exercise of ordinary care would have eliminated. We think this meets the foreseeability requirements of proximate cause. Under the evidence here, once the shoe was on the rail and wedged between the wheel and the brake shoe head, only one man could position himself to lift it. It appears that because of the manner that the crew was working at the time and in the absence of mechanical devices it became plaintiff's job to place himself in a kneeling position, and this put a strain on his back in lifting the shoe. It is our view that the answers of the jury to the foregoing issues are not against the great weight and preponderance of the evidence and Points 5 and 6 are each overruled.

Appellant's 7th Point is to the effect that the Court erred in its failure to

sustain objections "C" to Issue No. 15 of the Court's Charge,

"for the reason that there is no evidence in the record tending to show the rate of interest at which money can be safely invested in the vicinity of Harris County, Texas; that since this action is brought under the F.E.L.A., the Plaintiff is entitled to recover compensation for mental anxiety and physical pain and suffering which he may suffer in the future, and any diminished capacity to work and earn money in the future beyond the date of this trial; that such compensation is based upon the reasonable cash value of such items at the present time and the Defendant in such action is entitled to have taken into consideration the earning power of money in the vicinity in which the case is tried, which said issue fails to do. There is no evidence in the record tending to show the value of money in determining the element of damages included in Special Issue No. 15."

Appellant's complaint is decided adversely to it by virtue of an opinion of the Supreme Court of Texas in Missouri Pacific R. R. Co. v. Kimbrell, 334 S.W.2d 283. The opinion of the Texas Supreme Court is clear and comprehensive and is controlling.

■■ Appellant's 8th Point is to the effect that the amount of damages awarded by the jury is grossly excessive at least in the sum of $20,000, and the verdict should be set aside for the reason that an award so grossly excessive clearly evidences the deep seated prejudice on the part of the jury against Appellant and is clearly against the overwhelming preponderance of the evidence as to the extent of Appellee's injuries. In the alternative, appellant asks that the Court require a remittitur in the sum of $20,000 be filed, and in the event a remittitur is not filed, that the judgment should be set aside and a new trial ordered. Much testimony was tendered on the claimed injuries of the plaintiff, and we have considered it very carefully. No doubt the physicians who testified in this cause are outstanding in their respective fields. But under the Rule in Texas, the trier of the facts has the duty to pass upon the facts, and the jury may accept any witness's testimony in part, or it may reject it in part or may reject it in toto. The Rule is that "Opinion testimony does not establish any material fact as a matter of law." See Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345, Supreme Court, Points 1 to 3. We think the evidence shows that plaintiff is totally and permanently disabled, and he has not worked since July 1957. Testimony was tendered to the effect that in the 22 months immediately preceding plaintiff's injury there was only one month when his earnings did not exceed $340.08 per month. In that month his earnings were less, because he had suffered an amputation of a finger. For twelve of those months he earned $375 per month, and his monthly earnings ran as high as $422.73 per month. Evidence was to the effect that had plaintiff continued working he would have received at least one raise since his injuries and although he was making higher monthly earnings in 1957 before his injury than in 1956, yet if we adopt his 1956 earnings as a base he had lost over $8,500 in wages at the time of trial. Plaintiff was 57 years of age, and at that age he had an expectancy of 16.43 years. Assuming that his earning capacity should be limited to age 65, these eight years alone of which he was and will be deprived of earnings, eliminating raises and inflation, and taking the lower 1956 earnings as a base, would total $34,075.68, bearing in mind this is without consideration of pain, suffering and mental anguish. Dr. Lane, one of the appellant's witnesses, admitted that plaintiff had undergone severe pain; that he was not malingering and that plaintiff would have some permanent disability from the surgery alone, and that he might never be able to do hard work again. Dr. Moore, one of the appellant's witnesses, admitted signing plaintiff's exhibits 3 and 11, and these exhibits say in effect that plaintiff is totally disabled from performing each and every

kind of duty pertaining to his occupation, and they also say that the onset was July, 1957, and that plaintiff will be totally disabled from an "unknown" future date. Dr. David's testimony tendered on behalf of appellee was to the effect that plaintiff was totally and permanently disabled, and that he suffered and would continue to suffer physical pain, all as a result of the occurrence of July 13, 1957. Under the record here made, we cannot say that the verdict should be set aside for the reason that the award is so grossly excessive that it clearly evidences the deep seated prejudice on the part of the jury against appellant, nor do we think this Court should require that a remittitur in the sum of $20,000 or any other sum be filed by the appellee. Accordingly, Point 8 is overruled. We have carefully considered each of Appellant's Points 1 to 8 inclusive, and we are of the view that none presents error, and each is overruled.

Accordingly, the judgment of the Trial Court is Affirmed.